# United States Court of Appeals for the Federal Circuit

06-5016, -5024

BLUEBONNET SAVINGS BANK, F.S.B.,
CFSB CORPORATION,
and STONE CAPITAL, INC.,

Plaintiffs-Cross Appellants,

and

JAMES M. FAIL,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Mitchell R. Berger, Patton Boggs LLP, of Washington, DC, argued for plaintiffs-cross appellants, and James M. Fail. With him on the brief were Michael J. Schaengold and Ugo Colella. Of counsel on the brief was I. Thomas Bieging, Bieging, Shapiro & Burrus LLP, of Denver, Colorado.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, Jeanne E. Davidson, Deputy Director, Kenneth M. Dintzer, Senior Trial Attorney, Elizabeth M. Hosford and Richard B. Evans, Trial Attorneys. Of counsel was F. Jefferson Hughes, Trial Attorney.

Appealed from: United States Court of Federal Claims

Senior Judge Bohdan A. Futey

# United States Court of Appeals for the Federal Circuit

06-5016, -5024

BLUEBONNET SAVINGS BANK, F.S.B.,
CFSB CORPORATION,
and STONE CAPITAL, INC.,

Plaintiffs-Cross Appellants,

and

JAMES M. FAIL,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

---

DECIDED: October 11, 2006

---

Before NEWMAN, RADER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

In this long-running dispute, the Court of Federal Claims has awarded damages of $96,798,842 to plaintiff James M. Fail for the government's breach of contract. The government has appealed from that judgment, and the plaintiffs have filed a conditional cross-appeal. We affirm the damages award appealed by the government and therefore do not reach the cross-appeal.

I

This is one in a stream of cases arising out of the savings and loan crisis of the late 1980s. See generally United States v. Winstar Corp., 518 U.S. 839 (1996). At that time, hundreds of savings and loan institutions, or "thrifts," were either insolvent or on the verge of insolvency, and the Federal Savings and Loan Insurance Corporation ("FSLIC") lacked sufficient funds to liquidate them and pay the claims of insured depositors. The Federal Home Loan Bank Board therefore developed a plan to induce private investors to bail out the troubled thrifts. Under that program, the Board grouped insolvent thrifts into packages for sale and offered a variety of incentives, including guaranteed assistance payments, regulatory forbearances, and shared tax benefits, to induce private investors to purchase the thrifts.

In 1988, CFSB Corporation, a company owned entirely by James M. Fail, acquired the assets and liabilities of 15 insolvent thrifts, which were merged into a single thrift. The newly created thrift was later renamed Bluebonnet Savings Bank, F.S.B. Pursuant to a series of agreements entered into with the FSLIC, Mr. Fail and CFSB agreed to invest $120 million in cash in Bluebonnet, with an initial infusion of $70 million due in December 1988. Two additional installments of $25 million each would be due in 1989 and 1990. In return for that capital infusion, the government promised to provide $3 billion of assistance to Bluebonnet and agreed to several "forbearances," i.e., relief from otherwise-applicable regulatory requirements. The forbearances included allowing Bluebonnet (1) to maintain lower capital levels than would otherwise be required, (2) to pay dividends of up to 50% of its income as long as the designated capital levels were

maintained, and (3) to include certain subordinated debt in the calculation of its capital maintenance requirements.

The agreements required that half of the total cash infusion derive from the sale of Bluebonnet stock and half from the issuance of Bluebonnet capital notes. Pursuant to the agreements, Mr. Fail purchased $35 million of Bluebonnet common stock. He made that purchase with funds borrowed from Bankers Life and Casualty Company, an insurance company affiliated with Robert T. Shaw. In addition, Mr. Fail purchased $35 million of subordinated debt issued by Bluebonnet.

On August 9, 1989, the Financial Institutions Reform, Recovery, and Enforcement Act (“FIRREA”) was signed into law. FIRREA and its implementing regulations changed the capital requirements applicable to thrifts and altered the existing regulatory regime. Of particular relevance, FIRREA and its regulations prohibited thrifts from treating subordinated debt as regulatory capital. As a result, Bluebonnet’s regulatory capital level decreased by $35 million (the amount of the subordinated debt note that had been issued to Mr. Fail). That decrease meant that Bluebonnet was unable to comply with FIRREA’s new capital requirements.

Mr. Fail found it difficult to find capital sources that were willing either to invest in Bluebonnet or to provide financing. Consequently, when the second installment of capital infusion came due in December 1989, Mr. Fail borrowed an additional $25 million from Consolidated National Successor Corporation (“CNC”), a holding company owned in part by Mr. Shaw. In exchange, CNC received a right to a contingent interest amounting to 9% of the profits of CFSB as well as the right to acquire Bluebonnet or, alternatively, 50% of the net proceeds of any potential sale of Bluebonnet.

In December 1990, with the final installment of capital infusion coming due and the amount of the outstanding debt already up to approximately $80 million, Mr. Fail again turned to Mr. Shaw for assistance. Mr. Fail borrowed another $25 million and refinanced the loans from 1988 and 1989. That loan agreement included a provision that gave one of Mr. Shaw's companies the right to seek regulatory approval to purchase Bluebonnet from Mr. Fail.

By September 1992, however, Mr. Shaw had abandoned his efforts to acquire Bluebonnet, and Mr. Fail began negotiating for the repayment of the outstanding loans. At that time, the loan balance was approximately $140 million, and payment was due in December 1992. Mr. Fail, CFSB, and Mr. Shaw ultimately entered into a contract referred to as the Economic Benefits Agreement ("EBA") in which Mr. Shaw, through CNC, agreed to reduce the amount of Mr. Fail's debt and to provide long-term financing for the debt. In exchange, Mr. Fail gave CNC a 49% interest in the future profits of CFSB and the right to receive a percentage of the proceeds from any sale of Bluebonnet.

In 1995, Mr. Fail, CFSB, and Bluebonnet filed suit in the Court of Federal Claims, alleging that the enactment of FIRREA effected a breach of the government's obligations under the 1988 agreements. In 1999, the court granted the plaintiffs' motion for a partial summary judgment as to liability. Bluebonnet Sav. Bank, F.S.B. v. United States, 43 Fed. Cl. 69, 80 (1999) ("Bluebonnet I"). Following a trial on damages, the court held that the government's breach of the dividend forbearance, the regulatory capital level forbearance, and the subordinated debt forbearance increased the plaintiffs' credit risk, resulted in the plaintiffs' inability to obtain financing from sources

other than Mr. Shaw and his companies, and was a substantial factor in causing the plaintiffs to incur increased financing costs. Bluebonnet Sav. Bank, F.S.B. v. United States, 47 Fed. Cl. 156, 176-78 (2000) ("Bluebonnet II"). The court further found that it was objectively foreseeable at the time of contract formation that the breaches would cause the plaintiffs to incur increased financing costs. Id. at 173. Notwithstanding those findings, the court ruled that the plaintiffs had failed to prove the amount of their damages with reasonable certainty, and it therefore denied them any recovery on their claim.

On appeal, this court reversed and remanded with instructions to formulate an appropriate award of damages. Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1358 (Fed. Cir. 2001) ("Bluebonnet III"). First, we upheld the trial court's findings with respect to the issues of foreseeability and causation. We held that the trial court had "properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs because it forced Bluebonnet to raise capital at a time when FIRREA had made investments in thrifts riskier and considerably less attractive." Id. at 1356. With respect to the proof of damages, we upheld the trial court's finding that the plaintiffs had not proved their claim for damages other than those associated with the EBA. Id. at 1358. As to the EBA-related damages, however, we held that the plaintiffs had adequately substantiated the losses they suffered as a result of being forced to enter into the EBA. Id. at 1356-58. We explained that in the absence of the breach, "Fail and CFSB would not have agreed to the EBA because dividend financing would have been available and it would have been unnecessary to give up a significant equity stake in CFSB to obtain financing." Id. at 1356. We therefore

remanded with instructions to formulate an appropriate award of EBA-related damages. Id. at 1358.

On remand, the Court of Federal Claims held that it was "constrained by the mandate" of this court and awarded $132,398,200 in damages. Bluebonnet Sav. Bank, F.S.B. v. United States, 52 Fed. Cl. 75 (2002) ("Bluebonnet IV"). That amount represented the payments already made by Mr. Fail under the EBA as well as the entire value of the EBA debt. Id.

The government appealed from that award of damages, and we again remanded the case for further proceedings. Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341 (Fed. Cir. 2003) ("Bluebonnet V"). We held that rather than award the plaintiffs all the costs associated with the EBA, it was necessary to determine what costs the plaintiffs would have incurred in the absence of a breach. Id. at 1346. We explained that the fact that the plaintiffs "would not have needed to give up a significant equity interest in the absence of a breach does not mean that the amount of the EBA-related damages should necessarily be the full amount of the value of the equity interest transferred to Mr. Shaw." Id. at 1345. Because the surrender of equity as part of the EBA constituted a substantial conveyance of value to Mr. Shaw, we explained that "it may be that the other terms of the EBA through which the plaintiffs obtained long-term loans from Mr. Shaw were more favorable than the financing arrangement they would have been able to achieve absent a breach." Id. In that case, the proper damages award would be less than the full value of the transferred equity interest. Accordingly, the case was remanded to allow the Court of Federal Claims to conduct an inquiry into the "but-for financing costs" and to "use whatever means it deems appropriate, including

reopening the record if necessary, to assess the net effects of the breach." Id. at 1346. In addition, we reiterated a point made in our previous opinion, that "at a minimum, jury verdict damages would be appropriate in this case." Id.

On remand, the parties presented competing models in an effort to approximate the quantum of EBA-related damages. The plaintiffs submitted a model created by Professor Charles Calomiris, and the government submitted a model created by Professor Alan Shapiro. Professor Calomiris testified that under his model the plaintiffs were entitled to $129,827,388 in damages. Professor Shapiro testified that under his model the plaintiffs were due only $545,219. Under alternative versions of his analysis, Professor Shapiro calculated the damages to be $10,086,565 or, at most, $20,692,620.

The trial court found Professor Calomiris's model to be speculative, and it concluded that his evidence failed to establish with reasonable certainty that the plaintiffs were entitled to his full estimate of $129,827,388 in damages. Bluebonnet Sav. Bank, F.S.B. v. United States, 67 Fed. Cl. 231, 240 (2005) ("Bluebonnet VI"). The court reached that conclusion after rejecting two critical assumptions on which the Calomiris model was constructed: (1) that the plaintiffs would not have surrendered equity in order to obtain funding in the absence of a breach; and (2) that the damages analysis should focus on the 1992 time frame. Id. at 240-41. First, the court noted that Professor Calomiris had interpreted this court's prior statement—that it would have been unnecessary for the plaintiffs to give up a significant equity stake in CFSB to obtain financing—to mean that but for the breach the plaintiffs would not have had to surrender any equity interest in CFSB at all. The trial court ruled that this court's statement did not exclude the possibility of some equity surrender. The court explained

that there is "an entire range of percentages" that would "not constitute a 'significant equity' surrender." Id. at 241. Second, the trial court found that the Calomiris model incorrectly focused only on the 1992 time frame. Following this court's instruction to consider the alternatives to the EBA equity arrangement that the plaintiffs would have faced had there been no breach, the trial court explained that it is "entirely conceivable that the alternatives faced by plaintiffs could have come to fruition prior to 1992." Id.

Based on this court's prior statements that jury verdict damages would be appropriate in this case, the trial court decided to employ the jury verdict approach and explained that to facilitate the analysis it would adopt Professor Shapiro's damages model, with one adjustment. 67 Fed. Cl. at 242. Professor Shapiro found that in the absence of a breach, financing all three infusions of cash (the infusions of March 1989, December 1989, and December 1990) would have required CFSB to relinquish 47.1% of its equity. Id. at 242-44. The Shapiro model incorporated a combination of debt and equity financing and contained four basic assumptions: (1) that equity financing was likely in the "but-for" world; (2) that long-term financing would have been more attractive and more available in the absence of a breach; (3) that the model should examine the non-breach financing costs the plaintiffs would have faced beginning in March 1989; and (4) that the model should rely upon audited financial statements, as opposed to thrift financial reports. Id. at 244-50.

On the issue of equity financing, the trial court concluded that some equity financing would have been unavoidable even in the non-breach world. 67 Fed. Cl. at 246. The court stated that "it is reasonably certain that Mr. Fail would have accepted an offer for equity financing should it have been available . . . in the non-breach world,"

because Mr. Fail sought "financing prior to the breach that included equity financing, and [decided] to concede equity as part of the December 1989 financing." Id. at 244. The court also explained that the Shapiro model's "conclusion of a required equity surrender is further supported by the risk/return principle and the matching principle" because the higher risk associated with Bluebonnet would warrant equity financing and because investors typically do not use short-term loans to finance long-term liabilities. Id. at 245. The court further noted that the evidence showed that similarly structured bank holding companies were financed with equity and that all-debt financing options would have been limited in the plaintiffs' marketplace. Id.

The court also concluded that Professor Shapiro was correct to assume that, in the non-breach world, long-term financing "would have been more attractive and more available due to less lingering doubt over the passage of FIRREA." 67 Fed. Cl. at 248. The court explained that Mr. Fail's actions "display a preference for long-term financing" and that investors would have preferred long-term financing, in part because CFSB, short on capital, "would . . . have to roll over the loan . . . or find a different lender to assume another loan." Id. at 246. The court also found that "[a]bsent the breach, plaintiffs would have had access to a stream of dividends attracting more long-term financing suitors at more attractable terms." Id. at 247. Furthermore, the court noted that Professor Calomiris admitted that the plaintiffs "were hoping to get long-term financing but the breach put them in a position where they don't get the financing that they were hoping for." Id. at 248. In response to the plaintiffs' assertion that they would have chosen short-term financing so as to wait for the more favorable long-term rates

that arose in 1992, the court concluded that it was unlikely Mr. Fail could so accurately forecast short-term and long-term financing rates. Id. at 247.

The trial court also found merit in Professor Shapiro's decision to construct his model with a starting date of March 1989. The court explained that it had been the plaintiffs' "previous position . . . that the model should be constructed prior to 1992" and that the court had rejected that model not because of the start date, but because there was insufficient evidence to support the assumed interest rate. 67 Fed. Cl. at 248. Furthermore, one of the plaintiffs' experts had previously testified that the "pre-breach" chill caused by the impending enactment of FIRREA unfavorably impacted the plaintiffs' financing costs. Id. at 249. Consequently, the court held that the "harm in this case extended to a pre-FIRREA time-frame." Id.

The court further found that the Shapiro model properly relied on audited financial statements, as opposed to thrift financial reports. The court explained that the audited financial statements were more reliable and were consistent with both the projected earnings in the plaintiffs' business plan and a Report of Examination by the Office of Thrift Supervision. 67 Fed. Cl. at 250. In contrast, the court noted, federal regulators had characterized the thrift financial reports as "not accurate [and not] prepared in a timely manner." Id.

The trial court, however, did not adopt the Shapiro model in its entirety; the court found that Professor Shapiro erred in assuming that CFSB would have retired Mr. Fail's debt for free. 67 Fed. Cl. at 250. To the contrary, the court accepted the plaintiffs' argument that it was reasonable to conclude that CFSB would have obtained "a note payable from Mr. Fail in return for assuming his debt." Id. at 251. Moreover, the court

ruled that under one of the governing regulations, 12 C.F.R. § 584.6 (1989), CFSB would have been prevented "from 'assum[ing] any debt' without prior approval from [regulators]." 67 Fed. Cl. at 251. The court then determined that it was reasonable to suppose, as the plaintiffs suggested, that CFSB would have assumed Mr. Fail's debt in exchange for a note payable and that such an arrangement would have been approved by regulators.

The court thus adopted the correction to the Shapiro model that had been proposed by the plaintiffs' expert, Professor Calomiris. With that correction, the court determined that the percentage equity interest in CFSB that the plaintiffs would have had to surrender in order to obtain financing would decrease from 47.1% to 16.1%. 67 Fed. Cl. at 251. The court observed that this "drastic reduction of equity surrendered" would have occurred because a note payable from Mr. Fail to CFSB would have increased the total value of CFSB. Id. Such an increase in value would, in turn, lower the percentage of equity that would have to be relinquished to obtain financing in the "but-for" world, and thus diminish the but-for costs that would be applied in assessing the net financial effect of the breach. The court therefore concluded that the appropriate award of damages, using Professor Calomiris's corrected version of the Shapiro model, was $96,798,842.

The government filed a motion for reconsideration, contending that the court had erred in finding that it was "highly unlikely" that the FSLIC would have approved CFSB's assumption of Mr. Fail's debt. The government argued that subsection (e) of 12 C.F.R. § 584.6 required the FSLIC to approve any transaction conducted for the purpose of

making a capital contribution that would not impose an unreasonable or imprudent financial burden on CFSB.

The trial court denied the motion for reconsideration. The court first criticized the government for having "belatedly respond[ed] to plaintiffs' argument" regarding the issue of regulatory approval of CFSB's assumption of Mr. Fail's debt. The court further explained that the "figures and percentages employed in the court's analysis, including the equity surrender portion, independently originated from a jury's assessment of the evidence presented," and that the court's ruling "serves as a proxy for what a jury would have determined to constitute the true extent of the harm." Bluebonnet Sav. Bank, F.S.B. v. United States, No. 95-532C (Ct. Fed. Cl. Sept. 7, 2005) (order denying motion for reconsideration).

The government now appeals, challenging (1) the trial court's use of the jury verdict method of assessing damages, (2) the court's finding that federal regulators would not have approved CFSB's gratuitous assumption of Mr. Fail's debt, and (3) the overall reasonableness of the damages award. The plaintiffs have filed a conditional cross-appeal, in which they challenge the trial court's analysis of the competing Calomiris and Shapiro models, and urge an increase in the damages award in the event this court does not affirm the trial court's award of $96,798,842.

## II

### A

The government first argues that the trial court committed legal error by employing the jury verdict method, because the court "failed to find that plaintiffs demonstrated a justifiable inability to substantiate their damages." In the government's

view, the plaintiffs have "never asserted that they were unable to substantiate their 'but-for' costs" and have "simply been unable to present a credible model."

This court, however, has twice stated that the jury verdict method would be an appropriate means of determining damages in this case. In Bluebonnet III, we explained that jury verdict damages are allowed where there is "clear proof of injury and . . . no more reliable method for computing damages." In particular, we noted that it "would have been appropriate for the court to award jury verdict damages as a fair and reasonable approximation of EBA damages," even if Bluebonnet had not "adequately substantiated the damages it suffered as a result of entering into the EBA." 266 F.3d at 1357-58. And in Bluebonnet V, we again rejected the government's argument that it should pay no damages at all. In remanding for an inquiry into the but-for financing costs, we explicitly "reiterate[d] the point made in our prior opinion that, at a minimum, jury verdict damages would be appropriate in this case." 339 F.3d at 1346.

Notwithstanding our prior decisions approving the use of the jury verdict method in this case, the government contends that the plaintiffs failed to meet their burden of demonstrating a justifiable inability to substantiate their damages. In support of that contention, the government cites Dawco Construction, Inc. v. United States, 930 F.2d 872 (Fed. Cir. 1991). Dawco, however, is readily distinguishable. The pertinent issue in that construction contract case was the amount of the equitable adjustment due to the contractor for changes in the contract and for differing site conditions encountered during performance. This court disapproved the trial court's use of the jury verdict method of determining damages both because it concluded that Dawco could have identified its actual costs to an acceptable degree of certainty and because Dawco

offered no justification for not keeping track of the additional costs associated with the change order and with the differing site conditions. In this case, by contrast, the "but-for" costs at issue in the remand proceedings are not actual costs and can be determined only by using hypothetical modeling. Moreover, the government's argument is inconsistent with one of the underlying purposes of jury verdict damages; namely, to offer a "means for achieving a result that is fair and just to both parties when neither party has been able to present an independently complete or acceptable measure of damages." White Mountain Apache Tribe v. United States, 11 Cl. Ct. 614, 663 (1987) ("The fact finder is not required to choose between swallowing an expert's report whole, or rejecting it utterly, and usually, neither course is right.").

Finally, the record makes clear that the trial court's judgment was not simply an unguided estimate of what the court felt would be a reasonable approximation of a fair award. Rather, the damages award was based on the court's analysis of the competing economic models, and its conclusion that damages would be best represented by adopting Professor Shapiro's model with the correction discussed in Professor Calomiris's testimony. After completing those two steps, the court arrived at an award that was directly supported by evidence in the record—the amount corresponding to a hypothetical surrender of 16.1% equity in CFSB, which was provided by Professor Calomiris in his correction to the Shapiro model. While the court characterized its award as ultimately based on the jury verdict method, the court's reasoning closely mapped the presentations of the parties, with the court expressly adopting portions of the analysis proffered by each party. Therefore, even disregarding our previous statements that the jury verdict method would be appropriate in this case, we hold that

the method the trial court used to determine the quantum of damages did not violate any limitations this court has established for the use of the jury verdict method to calculate damages in contract cases.

B

The government next argues that the trial court erred in adopting Professor Calomiris's correction to Professor Shapiro's model. According to the government, the court adopted the modified version of the Shapiro model because the court concluded that, under the regulations governing savings and loan holding companies, and in particular 12 C.F.R. § 584.6, federal regulators would not have approved CFSB's gratuitous assumption of Mr. Fail's debt. There are two problems with the government's argument.

1. The first problem with the government's argument is that it is predicated on an unduly narrow reading of the trial court's opinion. The government interprets the trial court's opinion as modifying the Shapiro model based solely on the court's conclusion that federal regulators would not have approved CFSB's assumption of Mr. Fail's debt under the pertinent regulations. The trial court's opinion, however, indicates that the reasoning underlying the modification was not so narrowly focused. In addition to finding that section 584.6 of the thrift holding company regulations would have "kept CFSB from 'assum[ing] any debt' without prior approval" from federal regulators, the court also accepted the plaintiffs' broader argument that it was unreasonable for Professor Shapiro to assume that CFSB would have retired Mr. Fail's debt for free. Bluebonnet VI, 67 Fed. Cl. at 250-51. In particular, the court rejected Professor Shapiro's contention that "as a matter of economics," CFSB was simply the "alter ego"

of Mr. Fail, id. at 251, and that for purposes of the damages analysis it was irrelevant whether particular assets or obligations were attributed to CFSB or to Mr. Fail. The court's conclusion was supported by Professor Calomiris's observations that "if the corporation that you are the stockholder in assumes your debt for free, effectively it paid you a dividend" and that "from a tax standpoint . . . [you] would have had to pay tax on the dividend." Trial Tr. at 365.

Professor Calomiris testified that even if Mr. Fail could have obtained regulatory approval of "what Dr. Shapiro models, of having CFSB assume his personal debt," he would not have engaged in that transaction because he would have been forced to pay tax on what would have been a constructive dividend from CFSB. Trial Tr. at 364-65; see also Plaintiffs' Exhibit 4081 (asserting that Professor Shapiro's "informal consolidation" is "fundamentally flawed" because it ignores both "regulators" and "taxes"). As revealed in the cross-examination of Professor Shapiro, the taxes that would be due on that constructive dividend (arguably between $9 million and $15 million) would be significant because they would require a larger distribution by CFSB, and "there wasn't enough equity . . . to . . . support that kind of borrowing." Trial Tr. at 916-18 (Professor Shapiro). Professor Shapiro acknowledged that his model failed to take into account the potential tax implications of particular transactions; he simply assumed that the transaction "could be done in a tax efficient manner" because "[w]ealthy people have pretty good tax attorneys to figure this stuff out." Id. at 917. Consequently, the trial court accepted Professor Calomiris's testimony that the Shapiro model should be corrected so that the transaction would not be deemed a taxable dividend distribution (by taking something of value along with the debt). See Trial Tr. at

366-67 (in which Professor Calomiris discussed the creation in 1989 of a separate holding company, Stone Holdings, in order to correct the error in Professor Shapiro's model); see also Bluebonnet VI, 67 Fed. Cl. at 251 n.83.

The government's argument that the legal implications of transactions between Mr. Fail and CFSB can be ignored because they "were the same entity" for economic purposes is unpersuasive in light of the record before the trial court. In particular, the government asserts that the "offsetting compensation in the form of a note payable from Mr. Fail to CFSB would have had no effect upon CFSB's equity value because the overall assets would not increase, and Mr. Fail would be effectively writing a check from himself to himself." The trial court, however, properly rejected that argument, finding that it "must acknowledge the legal walls erected between Mr. Fail and CFSB" and noting that even "Professor Shapiro acknowledges that CFSB is a 'legally separate entity.'" Bluebonnet VI, 67 Fed. Cl. at 251. As the trial court explained, "the court is concerned with the law and not merely an economic view." Id.; cf. Trial Tr. at 737-38 (Professor Shapiro's testimony on the availability of "informal consolidations" as a "matter of economics").

In sum, the government's argument does not fully address the trial court's analysis, because it focuses almost entirely on the single issue of regulatory approval and fails to confront the question whether the transactional model envisaged by Professor Shapiro would have been unrealistic for other reasons.

2. With respect to whether federal regulators would have approved CFSB's gratuitous assumption of Mr. Fail's debt, the plaintiffs contend at the outset that the government has waived its challenge to the trial court's interpretation of the thrift holding

company regulations. Although the government makes an elaborate argument in its brief as to why federal regulators would have approved CFSB's assumption of Mr. Fail's debt notwithstanding the cited regulations, the government never made that argument to the trial court until its motion for reconsideration following the trial court's issuance of its decision. As the trial court noted in denying the motion, an argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived and not preserved for appeal. See Lamle v. Mattel, Inc., 394 F.3d 1355, 1359 n.1 (Fed. Cir. 2005); Caldwell v. United States, 391 F.3d 1226, 1235 (Fed. Cir. 2004); Mungo v. Taylor, 355 F.3d 969, 978 (7th Cir. 2004); Am. Meat Inst. v. Pridgeon, 724 F.2d 45, 47 (6th Cir. 1984).

While the government contends that it addressed the meaning of the regulations both at trial and in its post-trial brief, an examination of the record shows otherwise. At trial, the government objected to Professor Calomiris's testimony that federal regulators would not have approved the hypothesized CFSB–Fail transaction. The government's objection, however, was based solely on its assertion that Professor Calomiris was not qualified as an expert on savings and loan regulation and thus was not competent to testify on that subject. The government reiterated its objection, on the same ground, in its post-trial brief. It did not, however, make the argument that it made in its reconsideration motion, and that it has made at length in this court—that the text of the regulations does not support the trial court's ruling. The government failed to make that argument even though the plaintiffs, in their post-trial briefing, plainly asserted that under the governing regulations federal regulators would not have approved CFSB's

gratuitous assumption of Mr. Fail's debt.[1] Thus, the only issue that the government preserved in the trial court and for appeal is whether Professor Calomiris was competent to testify that the CFSB–Fail transaction would not have been approved and, if not, whether there was a fatal lack of evidence on that issue.

The government has not pressed that evidentiary objection vigorously on appeal. The government argues briefly that "there was no competent evidence to support the court's conclusion that [federal regulations would have barred the CFSB–Fail transaction]," because neither Professor Calomiris nor Professor Shapiro "purport[ed] to be an expert on thrift regulation." The government's argument about the incompetence of the evidence on this issue fails for two reasons. First, the trial court did not abuse its discretion in admitting Professor Calomiris's testimony on this issue. The government objected that Professor Calomiris had never been a federal regulator, that he had been involved in the thrift industry only since 2000, and thus that he did not have expertise in the regulation of thrift holding companies or personal experience relevant to the 1989-1992 time period. However, in light of Professor Calomiris's experience as the chairman of the board of a regulated thrift holding company and his experience as a consultant to federal banking regulators since 1988, it was within the court's discretion to admit his testimony about the regulation of thrift holding companies. Second, on cross-examination the plaintiffs elicited testimony from Professor Shapiro in which he

---

[1] The government hints that it was taken by surprise by the plaintiffs' argument that federal regulators would not have approved CFSB's gratuitous assumption of Mr. Fail's debt. In fact, however, that contention was a central focus of several of the plaintiffs' demonstrative exhibits, which were provided to the government in advance of the trial proceedings on remand.

acknowledged that the thrift holding company regulations would have applied to CFSB's assumption of Mr. Fail's debt. With respect to that evidence, there was no objection from the government. Furthermore, because the meaning of the regulations is a legal issue, it would have been proper for the trial court to address the scope of the regulations in the absence of opinion testimony from the expert witnesses. Accordingly, to the extent that the government now contests the trial court's interpretation of the thrift holding company regulations, it has waived that argument, and to the extent that it contests the trial court's decision on the ground that it was not supported by testimony from a competent witness, we reject that argument.

The government argues that in any event the waiver rule is prudential and should not be invoked where it would result in "a manifest error of law" or "manifest injustice." In the government's view, the trial court's interpretation of the 1989 thrift holding company regulations was plainly erroneous and caused a clear injustice, and thus this court should not permit the judgment in this case to rest on the trial court's analysis of those regulations. While there is ground for debate as to how regulators would interpret the regulations, we disagree that the regulations plainly support the government's contention that the CFSB–Fail debt assumption transaction was permissible under the regulations and thus clearly would have been approved.

The 1989 version of the thrift holding company regulations provides in part that "no savings and loan holding company [may] assume any debt, without the prior written approval" of FSLIC. 12 C.F.R. § 584.6(a). The regulations further provide that FSLIC will approve any such transaction if the proceeds of the transaction will be used for "making a capital contribution to a subsidiary insured institution," or "refunding,

extending, exchanging, or discharging an outstanding debt security, or for other necessary or urgent corporate needs, and would not impose an unreasonable or imprudent financial burden on the applicant." Id. § 584.6(e)(1).

The government first argues that the purpose of section 584.6 was "to prevent holding companies from assuming a debt that would cause the holding company to put pressure upon its subsidiary to pay dividends," thus forcing the subsidiaries to engage in riskier loans in order to build up greater dividends. Because that concern was not at issue in the CFSB–Fail transaction, the government argues, the regulations would not have been applicable to that transaction.

That argument is not a sufficient basis for holding the regulations inapplicable to the CFSB–Fail transaction. While a central concern motivating the regulations may have been to prevent holding companies from forcing subsidiaries to pay excessive dividends, the text of the regulations makes clear that they are broader than that in scope. By its terms, section 584.6(a) applies to a wide variety of transactions ("no savings and loan holding company . . . may issue, sell, renew, or guarantee any debt security . . . or assume any debt, without the prior written approval" of the FSLIC). It would disregard the plain language of the regulation to limit its scope to preventing holding companies from forcing subsidiary institutions to issue dividends.

The government also argues that section 584.6(e) of the regulations, which sets forth the transactions that the FSLIC will approve, would clearly apply to the CFSB–Fail transaction. We think it is far from clear, based on the language of the regulation alone, that the hypothesized CFSB–Fail transaction would qualify for approval under that subsection. The first portion of the subsection invoked by the government is section

584.6(e)(1)(i), which authorizes transactions such as the assumption of a debt if the transaction is for "the purpose of making a capital contribution to a subsidiary insured institution." According to the government, that provision applies to the assumption of Mr. Fail's debt because "the purpose of CFSB's assumption of the $35 million bridge loan to Mr. Fail, as posited by Professor Shapiro, was to facilitate the long-term financing of their capital infusion." That argument treats the regulation as if it provided for the approval of any debt assumption transaction that was part of an overall plan to finance the capitalization of a thrift. By its plain terms, however, the regulation is not that broad; instead, it applies only if the purpose of the transaction is "making a capital contribution" to the thrift. Here, the CFSB–Fail transaction would not have produced an additional capital contribution, and therefore it does not plainly fall within the scope of the provision for automatic regulatory approval.

The second portion of section 584.6(e) on which the government relies is section 584.6(e)(1)(ii). The government argues that federal regulators would automatically have authorized the approval of the CFSB–Fail debt assumption pursuant to that provision because that transaction was "required for discharging an outstanding debt security" and would "not impose an unreasonable or imprudent financial burden on the applicant." Section 584.6(e)(1)(ii) applies to transactions that serve "necessary or urgent corporate needs." It does not cover transactions that would discharge the indebtedness of a shareholder or owner of the holding company, such as Mr. Fail. As in the case of section 584.6(e)(1)(i), it is thus far from clear that section 584.6(e)(1)(ii) would have applied to the CFSB–Fail transaction about which Professor Shapiro testified. Accordingly, we are not persuaded that the trial court's interpretation of the thrift holding

company regulations was so plainly erroneous that it would result in manifest injustice to hold the government to the consequences of its failure to timely challenge the application of those regulations.

C

The government next argues that the trial court's award of $96,798,842 should be vacated because the court did not adequately explain why that amount represented a fair and reasonable approximation of the plaintiffs' damages. That argument is largely based on the government's assertion that the trial court was wrong to conclude that federal regulators would have required a personal note from Mr. Fail before approving CFSB's assumption of Mr. Fail's $35 million debt. The government further challenges the trial court's conclusion that Mr. Fail would have provided such a note, and that providing a note would have reduced CFSB's required equity surrender to only 16.1%.

We have already addressed the first point—that the trial court was wrong to conclude that federal regulators would not have approved a gratuitous assumption by CFSB of Mr. Fail's $35 million debt in March 1989. As to the second point—that Mr. Fail would have provided such a note—the government contends that there would have been essentially no difference between the note-supported transaction and the issuance of dividends to Mr. Fail with which he would pay off the $35 million loan. The answer to that argument, however, can be found in the government's own brief, where the government admits that a consequence of CFSB's issuance of dividends to Mr. Fail would be that "Mr. Fail would be required to pay taxes on the dividends he received from CFSB." In light of the large financial burden that would be entailed by the tax liability associated with the issuance of such dividends, it was reasonable for the trial

court to conclude that the parties would instead elect a note-supported assumption of debt by CFSB.

The government further contends that the trial court lacked a basis for holding that Mr. Fail's provision of a note would have reduced the required equity surrender to 16.1% of the equity value of CFSB. Yet the demonstrative exhibits accompanying Professor Calomiris's testimony explicitly show that correction of "Error 1" in the Shapiro model results in a "Total Cumulative Equity Surrender" of 16.1% and "Total Damages" of $96,798,842. See Plaintiffs' Exhibits 4080, 4089; Trial Tr. at 357, 379. Moreover, the government does not provide any calculation of its own, but simply dismisses Professor Calomiris's testimony in favor of Professor Shapiro's competing statements. As we explained in our previous opinion, the trial court is "in the best position to make the factual determinations necessary to establish an appropriate damages award," Bluebonnet V, 339 F.3d at 1346, and we defer to the conclusions of the trial court on factual questions such as the specific percentage of equity that would have been surrendered in the non-breach world.

Finally, the government contends that even if Mr. Fail had given a note to CFSB, the true value of the note would not have offset the $35 million assumed debt, because Mr. Fail did not have sufficient assets to cover a note of that size. As a consequence, the government argues, investors would not have regarded the note as lowering the risk of investing in CFSB, and thus would have required a larger share of equity in CFSB as an inducement to invest in the company. As the plaintiffs point out, however, the investors who lent $35 million to Mr. Fail in December 1988 and March 1989 were satisfied that he had sufficient collateral to support those loans. Moreover, the evidence

of record does not establish that Mr. Fail's assets would have been insufficient to support a $35 million note in March 1989. Evidence before the court at a prior stage in this case showed that Mr. Fail's net worth in December 1988 was estimated to be between $30 million and $40 million, and that Mr. Fail reported to federal regulators that his net worth was approximately $40 million during that time period. The trial court therefore did not commit clear error in concluding that Mr. Fail's personal note would have been sufficient to support the full value of CFSB's assumption of his $35 million debt. Accordingly, we reject the government's contention that the trial court erred in finding that the 16.1% equity interest in CFSB would have been sufficient to attract investors had there been no breach.

While the award in this case is large, the evidence brought out in the several evidentiary proceedings showed that the government's breach had a substantial impact on the plaintiffs' ability to obtain financing for their investment on attractive terms. As we have ruled before, the trial judge who has supervised the proceedings in this case for years is intimately familiar with the circumstances of the breach and the parties' competing presentations as to its financial consequences. Because determining the amount of the plaintiffs' loss depends on sophisticated analysis of a hypothetical state of affairs, the task of assessing damages in this case has been a demanding one, necessarily involving an exercise of judgment informed by immersion in a complex web of facts and projections as to how the facts would have unfolded in the hypothetical non-breach world. We are confident that the trial court exercised that judgment based on a full understanding and synthesis of those facts in light of the parties' presentations at trial. Accordingly, we uphold the trial court's award of $96,798,842 to plaintiffs as

damages for the government's breach of contract. Because the plaintiffs' cross-appeal is conditional on our rejection of the trial court's damages award, we do not address the cross-appeal.

AFFIRMED.