* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| FIRST FEDERAL LINCOLN BANK, | * | |
| Plaintiff, | * | |
| | * | No. 95-518C |
| v. | * | Filed: October 31, 2006 |
| THE UNITED STATES, | * | Winstar-related case; contracts; expectancy damages; lost profits; causation; reasonable certainty. |
| Defendant. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

*Edward L. Lublin*, Blank Rome LLP, Washington, D.C., for plaintiff. *Paul M. Honigberg*, *Lawrence S. Sher* and *Katia I. Fano*, Blank Rome LLP, of counsel.

*William G. Kanellis*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were *Stuart E. Schiffer*, Deputy Assistant Attorney General, *David M. Cohen*, Director, and *Jeanne E. Davidson*, Deputy Director, for defendant. *Scott D. Austin*, *Elizabeth A. Holt,* and *John J. Todor*, of counsel.

# OPINION

MARGOLIS, *Senior Judge*.

This Winstar-related case[1] is before the court following a nine-day trial on the issue of damages. In First Federal Lincoln Bank v. United States, 58 Fed. Cl. 363, 364 (2003) ("First Federal II"), plaintiff, First Federal Lincoln Bank ("Lincoln") alleged that defendant, United States (the "Government"), breached its contract with regard to transactions with three savings and loan associations by enacting the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. 101-73, 103 Stat. 183. The court held that a contract existed between Lincoln and the Government with regard to one of the three transactions, and that the Government was liable to Lincoln for damages that arose from the Government's breach of that contract. First Federal II, 58 Fed. Cl. at 370. The court also found that no contract existed between Lincoln and the Government with regard to the other two transactions. Id.

Lincoln argues that as a result of the breach, it is entitled to recover expectancy damages to place it in as good a position as it would have been in, and to receive the benefit of its agreement with the Government, had the Government not breached. Specifically, Lincoln asserts entitlement to profits allegedly lost due to the breach, measured by the difference between Lincoln's actual profits and an amount that would have been realized but for the breach, as estimated by experts on the basis of Lincoln's pre- and post-breach experience. The Government

[1]See United States v. Winstar, 518 U.S. 839 (1996).

counters that Lincoln's lost-profits model should be rejected and that the amount of damages suffered by Lincoln from the breach was zero. The Government argues that Lincoln cannot show causation between the breach and its alleged lost profits, nor that the damages were foreseeable. The Government also asserts that the lost profits alleged are speculative and cannot be calculated with reasonable certainty. The court finds that Lincoln is entitled to damages for lost franchise value of $4,501,818.

## BACKGROUND

Lincoln was a mutual thrift from its founding in 1907 until its stock conversion in 2002. In the 1980s Lincoln's business model employed an extensive branch office network as a vehicle to obtain low-cost deposits. As a thrift regulator explained at the time, Lincoln maintained a "system of low-cost branches throughout rural communities of Nebraska which provided a source of stable deposits and loan demand." Plaintiff's Exhibit admitted at trial ("PX") 437 at PL-0022389. Lincoln's primary source of savings deposits at this time was the individual depositor who lived in or nearby communities with a Lincoln branch office. In the Spring of 1989 Lincoln maintained 80 branch offices in Nebraska, Iowa, and Kansas, with the majority located in Nebraska.

This matter arises from Lincoln's 1982 supervisory mergers with three failing Nebraska thrifts: Great Plains Federal Savings and Loan Association of Falls City, Nebraska ("Great Plains"); Tri-Federal Savings and Loan Association of Wahoo, Nebraska; and Norfolk First Federal Savings and Loan Association of Norfolk, Nebraska.[2] The court's liability ruling in this case determined that a contract existed between Lincoln and the Government with regards to the Great Plains merger only. The three mergers generated approximately $41 million in supervisory goodwill, of which $19.8 million was associated with the Great Plains merger.[3] Pursuant to its agreement with the Government, Lincoln could use the Great Plains supervisory goodwill for all purposes, including compliance with federal regulations concerning minimum capital levels, over a 25-year amortization period. The Government breached this agreement by enacting FIRREA in August of 1989,[4] which eliminated the use of supervisory goodwill as a means of satisfying

---

[2]A comprehensive review of the factual and legal background surrounding these mergers can be found in First Federal Lincoln Bank v. United States, 54 Fed. Cl. 446 (2002) ("First Federal I").

[3]Under purchase method accounting, goodwill equaled the excess consideration paid by Lincoln, over the net fair value of any identifiable assets acquired and liabilities assumed.

[4]The history and circumstances surrounding the 1980s savings and loan crisis and the enactment of FIRREA have been extensively discussed and, therefore, will not be revisited here. See Winstar, 518 U.S. at 844-58.

capital requirements.[5] The Government's breach eliminated $13.9 million of unamortized Great Plains supervisory goodwill remaining in Lincoln's capital account in 1989. PX 1261 at PL-171689.

## DISCUSSION

Lost profits may be recovered where the plaintiff establishes by a preponderance of the evidence that (1) the loss was the proximate result of the breach; (2) the lost profits were foreseeable; and (3) a sufficient basis exists for estimating the lost profits with reasonable certainty. Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005) ("Cal. Fed. II"); Energy Capital Corp. v. United States, 302 F.3d 1314, 1324-25 (Fed. Cir. 2002). For purposes of this opinion, the court will address the second element, foreseeability, last.

### *I. Causation*

In order for a court to find lost profits, the plaintiff must prove that "the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment." Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996); Citizens Fin. Services, F.S.B. v. United States, 64 Fed. Cl. 498, 509 (2005). The breach must be more than a substantial factor in causing lost profits. Cal. Fed. II, 395 F.3d at 1268; Citizens Fin., 64 Fed. Cl. at 509. The plaintiff must be able to definitely establish a connection between the breach and the loss of profits. Cal. Fed. II, 395 F.3d at 1268. In this case, Lincoln argues that the Government's breach and the elimination of $13.9 million in supervisory goodwill from the thrift's capital account in 1989 caused the institution to shrink in the early 1990s through closing branch offices and running off deposits in order to meet elevated capital requirements. Lincoln asserts entitlement to profits the thrift allegedly would have realized had it not been forced to shrink the institution and forego growth and investment opportunities. The issue is whether the Government's breach of the Great Plains contract definitely caused Lincoln's shrink.

The Government argues that there is no link from the breach and the elimination of $13.9 million in Great Plains supervisory goodwill from the thrift's capital account in 1989 to Lincoln's shrink in the early 1990s. The Government asserts that prior to the breach, Lincoln did

---

[5]FIRREA required the Office of Thrift Supervision ("OTS") to issue regulations establishing separate tangible, core, and risk-based capital requirements for thrift savings associations. 12 U.S.C. § 1464(t). The OTS's capital regulations required thrifts to have (1) tangible capital equal to 1.5% of total assets; (2) core capital equal to 3% of adjusted total assets; and (3) risk-based capital equal to 6.4% of risk-weighted assets, stepping up to 8% by 1993. Com. Fed. Bank, F.S.B. v. United States, 59 Fed. Cl. 338, 343 (2004). FIRREA eliminated supervisory goodwill immediately for the purposes of calculating tangible capital and continued to allow the inclusion of a declining amount of supervisory goodwill (phased out to zero over a five-year period) in the calculation and reporting of core and risk-based capital. Id.

not leverage the Great Plains supervisory goodwill to create growth, but was losing significant amounts of deposits, customers, and market share. The Government contends that the reasons for Lincoln's shrink following the breach were pre-existing problems with core earnings, asset quality, and operating expenses related to the thrift's extensive branch office network. The Government asserts that despite the elimination of $13.9 million of supervisory goodwill from Lincoln's capital account the thrift never fell below FIRREA's minimum capital requirements, and Lincoln's actions in the early 1990s actually increased its profits.

Lincoln contends that prior to the breach it experienced profitable growth and operated with a regulatory capital cushion sufficient to absorb unforeseen losses**.** Lincoln argues that on the eve of FIRREA's enactment the thrift was implementing an aggressive growth strategy focused on deposit base and branch office expansion**.** Lincoln asserts that even though it never fell out of statutory capital compliance following FIRREA, the Government's breach caused Lincoln's shrink because its regulators imposed capital levels on the thrift in excess of those required by FIRREA, which restricted the types of assets Lincoln could hold, reversed its growth pattern and made the thrift less competitive. Lincoln asserts that it was not able to resume its pre-breach growth pattern until 1996, and did not regain its pre-breach market share until 2004.

*A. Lincoln's Branch Office Network*

The Federal Home Loan Bank Board ("FHLBB") conducted a regular examination of Lincoln in the Spring of 1987 and assigned the thrift a composite rating of "2"[6] and considered Lincoln "to be a well-run institution with capable management." PX 314 at WOL711 1439. The FHLBB conducted another examination of Lincoln in February of 1989 and again assigned the thrift a composite rating of "2." PX 437 at PL-0022380. The regulators concluded that Lincoln was "fundamentally sound, but may reflect modest weaknesses correctable in the normal course of business," and "able to survive business fluctuations quite well." Id. The FHLBB also reported that the "examination did not disclose any areas of material weakness," id., and "[p]roblem assets have been identified and are being satisfactorily monitored by management." Id. at PL-0022379. With regard to Lincoln's branch office network, the FHLBB stated that it "has proven to be a successful strategy," explaining that Lincoln "has branches in most Nebraska communities which feasibility studies have shown are likely to attract sufficient deposits to make the investment in fixed assets worthwhile." Id. at PL-0022389. With regard to the operating expenses from Lincoln's branch office network, the FHLBB concluded in a separate report prepared in the Spring of 1989 that while Lincoln's operating expenses may be above average for its peer group,

> they appear to be reasonable considering structure and over all business strategies of [Lincoln]. Additionally, [Lincoln's] net

[6]The FHLBB at this time employed a five-tier rating system for thrift institutions, with "1" being the highest or best rating. The sub-components to the system included evaluations of a thrift's management, asset quality, capital adequacy, risk management, and operating results. PX 437 at PL-0022380.

> interest margin is substantially higher than that of its peers which is primarily the result of the institution's cost of funds being less than that of its peer group. It has become evident that much planning goes into the institution's branching and that [Lincoln] maintains the logistical support necessary to efficiently operate the branch network.

Defendant's Exhibit admitted at trial ("DX") 338 at OFL001 0466. See also id. at OFL001 0463. It is clear from this evidence that immediately prior to the enactment of FIRREA, Lincoln's extensive branch office network was a "fundamentally sound" business model.

*B. Lincoln's Shrink*

The Government argues that beginning in 1989 and prior to the enactment of FIRREA, the thrift undertook an effort to reduce its operating expenses by closing branches, reducing administrative and marketing costs, and reducing personnel. The Government cites a regulator's statement in an internal document prepared in the Spring of 1989 that Lincoln at that time was considering closing three branches because of low deposit levels. Id. at OFL001 0464. The subject of the internal document in which this observation is recorded, however, is Lincoln's Spring 1989 application to open five new branch offices. Id. at OFL001 0463. The regulator also noted in this document that other regulators conducting an examination of the thrift at that time "did not note any areas of concern within [Lincoln's] branching operations." Id. at OFL001 0466. The regulator concluded that "there appears to be no reason to deny [Lincoln's] branch applications due to supervisory concern over the affects of [Lincoln's] branching strategy and practices on the institution's overall operations and profitability." Id. The Government also cites the hand-written notation in a regulator's monthly monitoring worksheet for August of 1989 that Lincoln "is undertaking another round of cost cutting" primarily through personnel attrition. PX 453 at WOL734 0987. Finally, the Government cites the minutes from Lincoln's semi-annual meeting, held in October of 1989, which report the thrift's goal of "Expense Reduction - by downsizing branches." PX 461 at PFL008 2773. The Government does not, however, point to any pre-breach contemporaneous documents, such as appear post-breach, memorializing a formal plan or strategy to shrink the institution through closing branch offices and running off deposits. Nor does the Government cite an instance prior to the breach where Lincoln closed a branch office because of supervisory or other concerns with operating costs associated with its branch office network.

When this evidence is placed in context with Lincoln's positive evaluation ratings during this period and its regulators' affirmation of Lincoln's business model, the evidence cited by the Government to show that Lincoln began to downsize its branch office network in order to address significant problems caused by its business model prior to the breach is not persuasive. Rather, the court concludes that the evidence reveals an institution's normal business concerns with reducing operating costs in order to enable its business model. In its 1989-1991 Business Plan, prepared in September of 1988, Lincoln explains that

> [a] physical presence and involvement in the local community have increased market penetration in many areas throughout the state. A

> very strong cost containment program has limited branch expenses, thus creating the opportunity to expand the branching network and provide a more complete line of products and services not offered by local institutions.

PX 291 at PFL002 0910 (emphasis added). The Government's evidence on this matter appears particularly anemic considering that of the 12 Board of Directors or Management Committee meetings Lincoln conducted from February of 1989 to April of 1990, the issue of reducing operating expenses is rarely discussed.

The contemporaneous evidence also suggests that in 1989 Lincoln did not intend to reduce its branch structure. In its 1989 report of examination in which the FHLBB deemed Lincoln "fundamentally sound" and assigned the institution a "2" composite rating, the FHLBB noted that Lincoln's

> fiscal department does cost/benefit analyses of existing branches to measure their profitability. In general, branches with a small deposit base are the least profitable. [Lincoln's Executive Vice President] Whitmore said in the future some of the unprofitable branches may be closed; however, he thinks this is a poor time to close branches with the current problems of the savings and loan industry as their closure could erode public confidence.

PX 437 at PL-0022389. Further, in 1988 and 1989 Lincoln acquired three branches in Iowa and Kansas, and pursued other expansion opportunities. The weight of the evidence convinces the court that Lincoln's pre-breach efforts to reduce its operating expenses were aimed at enabling the thrift's business model, and that Lincoln did not intend to shrink its branch office network at that time. To conclude the opposite - that Lincoln began its efforts to shrink the institution prior to the breach - requires a conclusion that Lincoln did so at a time when its regulators affirmed the thrift's business model and considered the institution to be fundamentally sound. The evidence cited by the Government does not support such a conclusion.

The Government also cites other evidence in support of its assertion that Lincoln began its shrink in 1989 and prior to the breach. First, the Government points to an internal OTS memo prepared in June of 1992 summarizing an examination exit meeting between Lincoln and its regulators. See PX 884. In this memo, it is stated that during the meeting OTS Assistant Director of Operations, Donald Kramer, "made complimentary remarks to [Lincoln] concerning ... difficult decisions beginning in 1989 to bring the institution to current condition," and "acknowledged that closing branches and eliminating personnel is not an easy job to do, but the necessary steps have been taken to improve earnings, capital and asset quality." Id. at WOL702 0477. At trial, Kramer testified that his remarks referred to "the action plans and the steps management and the board took, enacted to solve some of our supervisory concerns." Trial Transcript ("Tr.") at 1721:7-9. There are no documents from 1989, such as Board of Directors or Management Committee meeting minutes, that memorialize an "action plan" or other actions

taken to shrink the institution in response to regulators' supervisory concerns. Such documents, as well as regulators' supervisory concerns, do not appear until after the breach. In light of the absence of corroborating evidence, the court concludes that Kramer's 1992 statement that Lincoln began efforts to shrink the institution in 1989 to address supervisory concerns with the thrift's earnings, capital, and asset quality is not persuasive.

Second, the Government cites the trial testimony of Lincoln's then Vice President for Marketing, Edward Swotek, who stated on direct examination that Lincoln cut its marketing expenditures significantly between 1989 and 1990. Tr. at 833:18-24. A complete reading of Swotek's testimony suggests that Lincoln's reduction in marketing expenses occurred in 1990 and were in response to the enactment of FIRREA. Swotek testified that in 1988 and 1989 Lincoln was looking to expand its branches, Tr. at 832:11-14, and "in 1989 ... had about 1.7 million [dollars] in marketing expenditures," but that "the following year, 1990, that was cut almost in half to about 890,000 [dollars]." Tr. at 833:20-23. Swotek went on to explain that his job responsibilities changed in 1990, and after FIRREA when Lincoln "went from a company very much of growth and expansion and new offices and new employees ... to a whole new direction. It was one of shrinking and retracting, eventually closing offices." Tr. at 839:7-19. Given the clear import of Swotek's testimony when read in its entirety, the Government's reliance on it to support its assertion that Lincoln began its efforts to shrink the institution in 1989 and prior to the breach is not persuasive.

### *C. Lincoln's Capital*

#### *1. Regulators' assessment.*

In the examinations of Lincoln conducted immediately after the breach, regulators criticized the thrift's core earnings performance and high level of classified assets. See, e.g., PX 565 at FL001 1298. The evidence demonstrates that these criticisms flowed from, and were intertwined with, Lincoln's reduced capital position following the breach. During its examination conducted in June of 1990, the Federal Deposit Insurance Corporation ("FDIC") identified as its chief concern Lincoln's "significant volume of adversely classified assets, resulting from weak lending practices and compounded by deficiencies in the loan policy; marginal capital and earnings performance." PX 565 at PFL001 1293. The FDIC explained that although Lincoln met FIRREA's minimal capital requirements at that time, "the present level is deemed to be only marginally acceptable given the present significant level and severity of adversely classified assets as well as the less than favorable operating performance over the past several years." Id. at PFL001 1298. The FDIC noted that Lincoln's "volume of [adversely classified assets] has increased $16,345,000 from the previous examination and now offsets an alarming 93 percent of the thrift's tangible equity capital and reserves." Id. at PFL001 1304. The FDIC examiner who conducted the examination, Kathleen Campbell, testified at trial that

> while [Lincoln met] the minimum regulatory requirements for capital ... I still had concerns in that the assets, the level of adversely classified assets in relation to capital and coupled with

> the fact that the operating performance or the earnings performance over the past several years was weak, ... altogether that was my concern was those three factors intertwined, the relationship.

Tr. at 2008:17-2009:2 (emphasis added). See also Tr. at 1989:4-16 (FDIC examiner Campbell stating that the FDIC's evaluation of a thrift's capital, assets, management, earnings, and liquidity "are intertwined."); Tr. at 1721:22-25 (OTS regulator testifying that there is a "direct" relationship between earnings, capital, and asset quality). During the examination exit meeting between the FDIC and Lincoln conducted in October of 1990, a regulator noted that while the thrift's "capital ratios exceed minimum guidelines, they are considered marginal based on other important factors such as asset quality and nominal earnings." PX 609 at PFL002 0159. In a March 1991 letter to the OTS summarizing the results of its examination, the FDIC stated that Lincoln's tangible capital level was "inadequate in relation to the existing risk profile." PX 669 at PFL001 0316. In a letter to the thrift's individual directors advising of the FDIC's designation of Lincoln as a "problem institution" sent in March of 1991, the FDIC stated that

> [t]his office is very concerned with the level of problem assets and weak earnings performance. Our concerns are heightened due to an inadequate level of tangible capital. Unless earnings retention can be increased, an outside injection of capital may be necessary in order to achieve and maintain a level of tangible capital that is in line with the association's risk profile.

PX 670 at FFL001 0306 (emphasis added). In a separate letter to Lincoln in March of 1991 transmitting the FDIC's report of examination, the FDIC states that Lincoln's "level of adversely classified assets in relation to tangible capital and reserve is viewed as excessive...." PX 671 at PFL004 2167. See also PX 691 at PFL001 0253 (recording that the FDIC "explained to [Lincoln's president] that the thrift's overall risk profile at the time of examination was excessive given the high level of problem assets, especially in light of the marginal level of capital protection and modest earnings during recent times.").

The OTS conducted a separate review of Lincoln in July of 1990, which resulted in Lincoln's composite rating being downgraded to a "3" from the "2" it received in February of 1989. DX 472 at WOL 734 1751. This, the OTS explained, was "due to more adverse ratings in management, asset quality, capital and operating results." DX 475 at WOL734 1517. In its report of examination, the OTS noted that as "a percentage of tangible capital, [Lincoln's] criticized assets totaled 162 percent." DX 472 at WOL734 1764. In projecting Lincoln's capital compliance, the OTS recorded Lincoln's prediction that "tangible and core capital compliance will be easily maintained and risk-based capital will be maintained by managing risk-weighted assets." DX 472 at WOL734 1768. During the examination exit meeting between the OTS and Lincoln conducted in November of 1990, a regulator noted that the OTS's only concern with Lincoln's capital "was the level of core earnings." DX 499 at WOL734 1995.

The FDIC conducted a second post-breach examination of Lincoln in July of 1991. In the exit meeting between the regulators and Lincoln held in September of 1991, the FDIC noted that "[w]hile capital ratios have improved significantly since the 6-30-90 examination, they are considered marginal based on other important factors such as the poor earnings and significant remaining level of asset classifications." PX 759 at PFL001 0159. Based on the above documents and trial testimony detailing the Government's criticisms of Lincoln immediately following the breach, the court concludes that the severity of those criticisms was directly related to, and "intertwined" with, Lincoln's marginal capital position. It follows, then, that because the Government's breach reduced the thrift's capital account through the elimination of $13.9 million in supervisory goodwill, it heightened the regulators' criticisms of Lincoln's classified assets and core earnings.

*2. Capital requirements.*

The Government argues that the elimination of the Great Plains supervisory goodwill from Lincoln's capital account had no effect on the thrift because Lincoln met all of its capital requirements after the enactment of FIRREA. This argument, however, has been deemed unpersuasive on the issue of causation in other Winstar-related cases. Even if it is true that a thrift's regulatory capital was greater than the amount necessary to maintain its mandatory minimum, that does not prove that the thrift was not injured by the loss of supervisory goodwill. Home Sav. of America, F.S.B. v. United States, 57 Fed. Cl. 694, 721 (2003); Com. Fed. Bank, 59 Fed. Cl. at 347. A thrift is "entitled to manage its capital conservatively, maintaining a cushion ... adequate to protect against the vagaries of the market." Id. "There is a significant risk in operating too close to the regulatory minimums." Com. Fed, 59 Fed. Cl. at 347. In this case, Lincoln's post-breach capital levels, although meeting the regulatory minimums, were deemed marginal by its regulators, see, e.g., PX 565 at PFL001 1298, and did not afford the thrift a cushion to protect against "the vagaries of the market." Supervisory action to force the thrift to obtain an outside injection of capital may be required. See Tr. at 2040:20-24 (FDIC examiner Campbell agreeing on cross-examination that the potential of supervisory action to force a thrift to obtain an outside injection of capital constituted a serious threat to the institution).

Prior to the breach in February of 1989, the FHLBB assigned Lincoln a composite rating of "2," deeming the institution "fundamentally sound" and free from material weaknesses. PX 437 at PL-0022380. In June of 1990, the FDIC assigned Lincoln a composite rating of "4," deeming the thrift a "problem institution," PX 670 at FFL001 0306, having "an immoderate volume of serious financial weaknesses or a combination of other conditions that are unsatisfactory. Major and serious problems or unsafe or unsound conditions may exist which are not being satisfactorily addressed or resolved." PX 565 at FFL001 1302. In July of 1990, the OTS assigned Lincoln a composite rating of "3," deeming it "marginally resistant to the onset of adverse business conditions and could easily deteriorate if concerted action is not effective in correcting the areas of weakness." DX 472 at WOL734 1751. A "3" rating meant that Lincoln was "presumed to warrant formal enforcement action," DX 475 at WOL734 1517, although the OTS decided not to do so at that time. DX 499 at WOL734 1996.

In March of 1991, the FDIC informed the OTS that "[u]nless the results of our planned third quarter 1991 review [of Lincoln] reflect a level of tangible capital that will yield a relationship of at least 4 to 5 percent, or whatever higher amount is reasonable given the then-existing risk profile, it will be our intent to recommend that OTS initiate action to provide for an outside injection of capital funds." PX 669 at PFL001 0316. Also in March of 1991, the FDIC informed Lincoln's individual directors that "[u]nless earnings retention can be increased, an outside injection of capital may be necessary in order to achieve and maintain a level of tangible capital that is in line with the association's risk profile." PX 670 at FFL001 0306. See also PX 671 at PFL004 2167 (FDIC letter to thrift's entire board). During a meeting between the OTS, the FDIC, and Lincoln conducted in April of 1991, Lincoln's president at that time, Vern Roschewski, asked the regulators "what amount [of capital] it would take to lessen [the regulators'] overall concerns about the thrift." PX 691 at PFL001 0254. A regulator indicated that "a 5 percent minimum was being considered but qualified the remark by mentioning that the overall risk profile of any institution weighed heavy in assessing capital adequacy." Id. In response, Roschewski "indicated the thrift would do whatever was necessary to achieve a more acceptable level of capital." Id. Roschewski testified at trial that following this meeting it was his impression that if Lincoln did not increase its capital levels, the thrift "would have been gone pretty soon. When you step to a 4, it is very easy to step to a 5. And at a 5, the [Resolution Trust Corporation] has you and you are on the bid." Tr. at 235:19-25. In the report summarizing the meeting, an FDIC regulator concluded that if the upcoming third quarter examination of Lincoln did not "reflect overall improvement ... it would be our plan to recommend action under Section 8(t) of the FDI Act to require an outside injection [of capital]." PX 691 at PFL001 0254. In addition, an OTS regulator noted in a separate document prepared in the Spring of 1991 that Lincoln "is below the capital levels expected for a '2' rated institution." DX 534 at WOL712 0264. In May of 1991, Roschewski informed the OTS that Lincoln had "made the decision that to meet the new net worth requirements of 4-5%, it would require additional branch office closings and reduction of personnel in branch operations and staff operations." PX 694 at PFL002 1124.

Following the FDIC's July 1991 exam of Lincoln in which the thrift reported a tangible capital ratio of 3.35%, PX 788 at PFL004 2827, the FDIC upgraded Lincoln's composite rating from a "4" to a "3." Id. at PFL004 2830. The FDIC concluded that Lincoln's "capital levels, while currently above regulatory minimum levels, is not sufficiently above such standards to withstand any major unforeseen difficulties without being supplemented from other sources, particularly if earnings do not improve." Id. at PFL004 2827. Following a March 1992 exam of Lincoln in which Lincoln reported a tangible capital ratio of 4.21%, PX 857 at PFL001 0715, the FDIC assigned Lincoln a composite rating of "2," deeming the institution once again "fundamentally sound." Id. at PFL001 0716. During a meeting with the OTS in June of 1992, regulators recorded Roschewski's statement that "he does not want [Lincoln] to ever be considered a 'problem' institution again. And that is why the attainment of 5 percent tangible capital is a key." PX 884 at WOL702 0477. Based on the weight of the evidence, the court concludes that maintaining a "marginal" capital position following the breach was not sufficient for Lincoln to regain its pre-breach designation as a "fundamentally sound" institution. Rather, it is clear that Lincoln had no option but to achieve capital ratios above the regulatory minimums in

order to rehabilitate itself following its regulators' post-breach negative assessments of the thrift and to prevent regulatory action forcing the thrift to obtain an outside injection of capital.

*3. Lincoln's reaction to regulators' criticisms.*

Following the FDIC's and the OTS's examinations of Lincoln in the Summer of 1990, the thrift's management conducted an executive strategy session on October 31 and November 1, 1990. See PX 616. A significant issue discussed during the meeting, as described in worksheets prepared for the meeting, was "Capital - Capital - Capital" and the thrift "[n]ot being able to meet capital requirements." Id. at PFL002 2121. In order to improve its capital position through expense controls, Lincoln's management determined it must "[e]liminate certain minimal profit or loss operations, close branches, farm, equipment, dealer, some insurance products. Staff reduction." Id. at PFL002 2122. In its 1991 Business Plan, Lincoln initiated an "action plan" to reduce the expenses associated with its branch network. PX 634 at PFL002 0810-11. The action plan directed the closing of 12 branch offices and the elimination of nonessential jobs. Id. at PFL002 0810. In addition, the 1991 Business Plan directed the thrift to "[p]rice savings interest rates at yields that will allow de minimis growth." Id. at PFL002 0809. In the Spring of 1991, Lincoln targeted a reduction in assets by $100 million to $1.1 billion by the end of 1992. PX 692 at PFL002 1759. Also in the Spring of 1991, Lincoln decided to close 10 additional branch offices. PX 694 at PFL002 1124-25. In the Fall of 1991, the OTS allowed Lincoln to acquire two Iowa branches because the transactions were capital neutral. PX 762 at ODD 007 0573. In Lincoln's 1992 Business Plan, the thrift reported that

> [t]he enactment of FIRREA has caused a turnaround in management philosophy. From one of growth, branching and seeking merger acquisitions, aggressive marketing of both savings deposits and all types of lending, to one which plans reduction in size, closing branches, discontinuing equipment lending, agricultural lending, and income property lending.

PX 827 at PL-172073. The FDIC reported in March of 1992 that Lincoln was "attempting to reduce its size to approximately $1.1 billion mainly through deposit run-off.... The institution is approaching its target size and will need to curtail the run-off of deposits in the future to maintain the projected size." PX 857 at FL001 0726. In April of 1992, Lincoln closed six additional branch offices, bringing the total of Lincoln's post-breach closed branches to 28. PX 813; PX 868 at PFL009 0108. Of the 28 branches Lincoln closed, 24 were located in Nebraska.

The issue is whether the Government's breach and elimination of $13.9 million in supervisory goodwill from Lincoln's capital account in 1989 was more than a substantial factor contributing to, and definitely caused, Lincoln's shrink in the early 1990s. The Government asserts that there is no connection between the breach and Lincoln's shrink because it was the thrift's earnings and asset quality problems that caused Lincoln's post-breach shrink and not the elimination of supervisory goodwill. In support, the Government cites the testimony of FDIC examiner Campbell, who testified that even if Lincoln were able to count an additional $14

million toward its regulatory capital levels, the criticized asset ratio would have been roughly 72%, which would still have been of regulatory concern in June of 1990. Tr. at 2005:8-2006:18; 2010:22-2011:10. Lincoln argues that the elimination of $13.9 million of Great Plains supervisory goodwill, or 20% of Lincoln's regulatory capital in 1989, was more than a significant factor contributing to the institution's post-breach shrink. In support, Lincoln cites the trial testimony of OTS regulator Kramer, who on cross-examination agreed that the loss of 20% of a thrift's regulatory capital would be significant. Tr. at 1742:8-11. Lincoln's expert on damages calculates that but for the breach, Lincoln as of December 31, 1990, would have reported a 3.9% tangible capital ratio.

The court concluded supra that the regulators' criticisms of Lincoln's asset quality and core earnings performance were directly related to, or "intertwined" with, the thrift's post-breach marginal capital position. The Government's argument that the regulators' post-breach criticisms of the thrift's asset quality and earnings performance were independent from Lincoln's diminished capital position is not supported by the evidence. The court is also convinced that given the intertwined relationship of capital, asset quality, and earnings performance, the extent of Lincoln's post-breach shrink - undertaken to improve the thrift's capital ratios - would have lessened if the thrift's capital account was increased by $13.9 million. The court therefore concludes that the Government's breach of the Great Plains contract caused substantial harm to Lincoln.

*II. Reasonable Certainty*

A plaintiff may recover lost profits caused by the breach where "'the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made.'" Cal. Fed. Bank F.S.B. v. United States, 245 F.3d 1342, 1349 (Fed. Cir. 2001) ("Cal. Fed. I") (quoting Neely v. United States, 285 F.2d 438, 443 (Ct. Cl. 1961)). The "ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("Bluebonnet III") (quoting Electronic & Missile Facilities, Inc. v. United States, 416 F.2d 1345, 1358 (Ct. Cl. 1969)). In this case, the issue is whether there is some basis upon which a reasonable approximation of Lincoln's lost profits due to its post-breach shrink caused by the elimination of the Great Plains supervisory goodwill can be made.

*A. Lincoln's Lost Profits Model*

Lincoln claims $30,688,000 in expectancy damages from the Government's breach. This figure is based on a lost profits model prepared by plaintiff's expert, Dr. Donald Kaplan. Dr. Kaplan's original model was prepared prior to the liability decision in this case and calculated Lincoln's lost profits from June of 1991 to June of 2004 based on the elimination of the supervisory goodwill related to all three 1982 mergers. Following the court's liability ruling, Dr.

Kaplan revised this model in an attempt to account for the elimination of just the Great Plains supervisory goodwill.

Dr. Kaplan's lost profits model is based on $550 million of foregone deposits Lincoln allegedly would have possessed had the thrift not engaged in its shrink strategy following the breach. Specifically, the alleged foregone deposit amount consists of: (1) $300 million in deposits lost due to the shrink ($225 million from the runoff of deposits from branches that remained open and $75 million from closed branches); and (2) $250 million in deposits lost from missed growth opportunities. Dr. Kaplan states that Lincoln's lost profits equals the sum of $24,914,000 in lost earnings on the foregone deposits plus $41,800,000 in lost franchise value due to forgone deposits, multiplied by 46%, which represents the percentage of Great Plains supervisory goodwill eliminated by the breach. Total lost profits equals $66.7 million. Dr. Kaplan states that Lincoln's lost earnings on the foregone deposits equals its net interest spread minus the sum of certain adjustments plus a branch sale premium. Dr. Kaplan calculates Lincoln's net interest spread as its yield on assets minus the thrift's cost of funds. Dr. Kaplan states that Lincoln's lost franchise value due to foregone deposits is based on a branch sale premium derived from comparing subject branches with actual branch sales transactions, then adjusting for factors including location, deposit mix, size and operating efficiency. Dr. Kaplan asserts that this methodology is the standard valuation technique in the banking industry.

The Government asserts that Dr. Kaplan's lost profits model is counterfactual and unsupported by contemporaneous evidence, and is laden with methodological defects, such as to render its conclusions speculative. Specifically, the Government asserts that Dr. Kaplan's model does not distinguish between actions Lincoln undertook because of the breach and actions unrelated to the breach. The Government argues that Dr. Kaplan's model is speculative because it does not identify Lincoln's growth opportunities or investments in the non-breach environment, and the investment proxy Dr. Kaplan utilizes to estimate Lincoln's net interest margin contravenes the thrift's actual experience. The Government also asserts that Dr. Kaplan's calculation of Lincoln's net interest spread, cost of funds offset, and lost franchise value are fraught with methodological defects that render his conclusions speculative.

*B. Deposit Growth*

Dr. Kaplan calculated Lincoln's pre-breach consolidated (Nebraska, Iowa, and Kansas) annual deposit growth rate from 1980 to 1989 as 5.7%. Dr. Kaplan estimated that the breach caused Lincoln to forego deposit growth of $250 million based on a projected post-breach deposit growth rate of 3.1%, which was equivalent to the Nebraska state average annual growth rate from 1989 to 2004. Dr. Kaplan asserts that because the post-breach Nebraska state average annual growth rate is lower than Lincoln's actual pre-breach demonstrated performance, his projection is conservative and therefore provides a reasonable basis from which to estimate Lincoln's foregone deposits. In response, the Government asserts that Lincoln's pre-breach growth does not provide a reasonable basis to support Dr. Kaplan's post-breach projections. The Government's expert, David Kennedy, C.P.A., calculated Lincoln's combined annual deposit growth rate from 1981 to 1989 excluding branch acquisitions at 2.41%. Kennedy asserts that

Lincoln's growth rate declined in three of the years between 1986 and 1989, and calculated that Lincoln's tangible assets did not grow from June of 1983 to June of 1990. Kennedy stated that Lincoln failed to meet its own pre-breach deposit growth rate projections as stated in the thrift's business plans. Further, Kennedy reported that following the breach, Lincoln was not able to grow its deposits at 3.1% in four of the six fiscal years after Lincoln declared that its tangible capital was "more than adequate," and in three of the five fiscal years following its declaration that it was "poised for growth."

The court in Com. Fed. analyzed a lost profits damages model similar to the model at issue in this case. In accepting as reasonable the projections made regarding the thrift's post-breach rate of growth, that court emphasized the thrift's demonstrated pre-breach performance. The court explained that

> [t]here was not a single year prior to the [merger] that ... plaintiff failed to grow its assets or build its capital, both of which were used to generate profits for the institution. This pattern of growth in assets, capital, and profits was repeated year in and year out, through periods of high and low interest rates, including periods of economic recession and boom.... Although the parties dispute the importance of the various sources of plaintiff's growth after [the merger], by all accounts, plaintiff did continue its long-standing pattern of profitable growth.

59 Fed. Cl. at 342-43. See also Globe Sav. Bank, F.S.B. v. United States, 65 Fed. Cl. 330, 350 (2005) ("[i]ndisputably, Globe was profitable at the time of the government's breach."), aff'd, No. 06-5001, 2006 WL 2045776 (Fed. Cir. July 20, 2006). The court in Com. Fed. also found important the thrift's ability to meet its own growth projections:

> [p]laintiff intended to grow to '300 million [dollars in assets] before the end of September 1990,' in part on the basis of the capital received through the [the merger]. From the date of the [the merger] until several months before FIRREA was enacted, plaintiff did, in fact, profitably grow its assets at a rate of nearly 25 percent per year, to $269,000,000.... On the strength of this history, the court found [the thrift's president] highly credible in his testimony that 'we were able to grow our association almost whenever we had the right capital to do it with.'

Id. at 345. See also Globe, 65 Fed. Cl. at 351 ("[Plaintiff thrift] had received the regulators' approval to grow to approximately $960 million during its initial three years of operation, and it was well en route toward such growth prior to the breach."). In Com. Fed. the thrift's clear record of pre-breach growth was integral to the court's acceptance of the plaintiff's expert's projection of the thrift's post-breach growth.

In this case, Lincoln's demonstrated performance is not analogous to the clear and consistent growth rates demonstrated by the thrifts in Com. Fed. and Globe. With regards to its deposits, Lincoln reported declines in the years 1985 through 1987, and 1989 to 1990. Following the breach, Lincoln announced at the end of 1992 its intention to stabilize its deposit base and retain savings. See PX 969 at PFL002 1035; see also PX 1012 at PL-0002138 (restating thrift's goal to stabilize its deposit base in 1994). The thrift's deposits, however, proceeded to decline in the years 1993, 1994, 1995, 1996, 1997, and 1999 to 2000. Based on this evidence, the court concludes that Lincoln's pre- and post-breach performance does not provide a basis upon which to accept Dr. Kaplan's projection of the thrift's post-breach deposit growth rate, and therefore rejects as speculative Dr. Kaplan's projection that Lincoln would have grown its deposits by $250 million but for the breach.

*C. Yield on Foregone Assets*

To calculate Lincoln's yield on forgone assets, Dr. Kaplan adopts the average yield of the adjustable rate mortgage backed security ("MBS") at 6.47%, even though Lincoln had dropped its MBS portfolio soon after the breach. Dr. Kaplan asserts that using the MBS figure produces a conservative yield on forgone deposits estimate because Lincoln's yield on its actual post-breach assets was higher at 7.38%. Dr. Kaplan contends that Lincoln's actual post-breach investment portfolio does not provide an acceptable basis upon which to project the thrift's yield on foregone deposits because Lincoln's asset mix changed throughout the post-breach period for breach and non-breach related reasons, and cannot reasonably reflect what the thrift's yields would be in a non-breach world.

The Government's expert, Kennedy, argues that Dr. Kaplan's utilization of the MBS "fully indexed rate" is erroneous because it is not equivalent to the yield actually earned by the investor from this investment because it does not account for individual investment risk. Kennedy also states that the "net margin" that Dr. Kaplan adds to the underlying index is overstated. The "net margin," Kennedy explains, is a constant spread, not a yield spread, because it does not take into account the impact on the yield by purchase premiums/discounts, teaser rates, and pre-payment spreads. Kennedy asserts that the "net effect margin" is the most commonly used method of evaluation for adjustable rate MBS investments, and it measures the yield spread over the underlying index rate.

The court's decision in Com. Fed. does not support Dr. Kaplan's reliance on the adjustable rate MBS as a proxy for Lincoln's yield on foregone deposits. In that case, the court determined that the plaintiff's expert's projection of the thrift's yield on foregone assets was reasonable because it was based on the performance of investments the thrift actually maintained after the breach. Com. Fed. 59 Fed. Cl. at 351 ("[a]lthough plaintiff's model uses a process of projection, it is grounded in the actual performance of the bank both pre-FIRREA and post-conversion."). In an opinion rejecting a thrift's claim for lost profits, the court in Citizens Fin.

refused to accept the plaintiff's expert's conclusion that continued investment in mortgage backed securities would guarantee the thrift a certain return on assets. As that court explained:

> [a]side from providing the court with general testimony regarding the 'limitless' availability of various mortgage-backed securities, [plaintiff's expert] Professor Horvitz never explained exactly how Citizens' asset portfolio would be structured. Professor Horvitz did not think it mattered. He asserted that 'regardless of what that combination of assets is,' the thrift would still earn a 1.1% rate of return. In fact, Professor Horvitz testified that Citizens would have been able to earn the same 1.1% rate of return if it invested entirely in mortgage-backed securities and had acquired them with only jumbo CDs. However, he presented no evidence to show which mortgage-backed securities were available during the forgone-asset period and whether Citizens would have been willing to accept the level of risk associated with those securities.

64 Fed. Cl. at 512. The court in Citizens Fin. rejected the plaintiff's expert's use of the adjustable rate MBS to project the thrift's yield on assets even though the thrift maintained that investment in its portfolio at the time of the breach. Id. at 511. In the present case, Lincoln did not maintain the adjustable rate MBS in its investment portfolio following the breach, nor does Dr. Kaplan explain how Lincoln's portfolio would be structured, the availability of the adjustable rate MBS for Lincoln to invest in, and the impact of risk on Lincoln's investment strategy. The court therefore concludes that the use of the adjustable rate MBS as a proxy in this case does not provide a reasonably certain basis upon which to project Lincoln's yield on foregone deposits following the breach.

*D. Lost Franchise Value*

As explained supra, Dr. Kaplan's lost profits model calculates Lincoln's damages based on $550 million in foregone deposits the thrift allegedly lost as a result of the Government's breach. Dr. Kaplan's foregone deposit amount is derived from Lincoln's post-breach (1) shrink and (2) missed growth opportunities. The court concluded supra that Dr. Kaplan's projection of Lincoln's post-breach deposit growth rate is speculative and therefore rejects the alleged $250 million in foregone deposits from Lincoln's missed growth opportunities that Dr. Kaplan factors into his lost profits model. Remaining is the alleged $300 million in foregone deposits from Lincoln's post-breach shrink, which is comprised of $225 million from deposit runoff and $75 million from branch office closings. The court concluded supra that the breach caused Lincoln to shrink its institution and, therefore, Lincoln may recover damages from the foregone deposits due to that shrink.

As explained supra, Dr. Kaplan's lost profits model calculates damages by adding Lincoln's lost earnings from foregone deposits with Lincoln's lost franchise value due to foregone deposits and is then reduced pro rata by multiplying it by 46%. The court concluded

supra that Dr. Kaplan's calculation of Lincoln's lost earnings from foregone deposits is speculative because it relies on a proxy to determine the thrift's yield on foregone assets. What remains of Dr. Kaplan's lost profits model is his calculation of Lincoln's lost franchise value due to the foregone deposits caused by the thrift's post-breach shrink. According to Dr. Kaplan, a lost franchise value calculation determines the value the thrift's deposit franchise would have had on the date of trial had the Government not breached its contract. Dr. Kaplan calculates Lincoln's lost franchise value by multiplying the thrift's foregone deposits by a branch sale premium. Dr. Kaplan asserts that this methodology approximates the discounted present value of the net interest income, operating expenses, and fee income generated by the foregone deposits in perpetuity. To calculate Lincoln's lost franchise value, Dr. Kaplan utilizes the median branch sale premium for all large branch transactions (more than ten branches) in the United States, reduced by 25% to account for the specific performance of Midwest branch transactions.

The Government asserts that Dr. Kaplan's lost franchise value is speculative because he failed to consider that some of the branch offices Lincoln closed were unprofitable and that Lincoln's deposit runoff consisted of high cost certificates of deposits which would not provide a deposit premium. The Government also argues that the actual experience of the branch offices Lincoln closed did not support Dr. Kaplan's use of the median United States premium for large branch transactions in his calculation. In response, Lincoln asserts that Dr. Kaplan's lost franchise value calculation is based on a sound methodology similar to the methodology accepted by the court in Globe, and affirmed by the Federal Circuit. Lincoln asserts that the Government's criticism incorrectly focuses on the branch offices Lincoln closed, when Dr. Kaplan's lost franchise calculation is based on the aggregate amount of foregone deposits - the vast majority of which came from the thrift's runoff of deposits from branch offices that remained open.

When adjusted, Dr. Kaplan's lost franchise value calculation does provide a reasonably certain basis to determine Lincoln's damages from the breach. A lost franchise value calculation similar to Dr. Kaplan's was accepted by the court in Globe, 65 Fed. Cl. at 358-61, and affirmed by the Federal Circuit, 2006 WL 2045776. The first adjustment to be made to Dr. Kaplan's calculation is the amount of foregone deposits from which Lincoln could obtain a branch sale premium. As explained supra the $250 million in foregone deposits due to missed growth opportunities are speculative and therefore cannot be factored into the calculation. What remains is the alleged $300 million in forgone deposits due to Lincoln's post-breach shrink. It must therefore be determined whether this figure is reasonable.

From June 30, 1990 to June 30, 1995 Lincoln's deposits declined by $296,459,598.[7] Compare PX 720 at PFL006 1429 with PX 1080 at PFL006 1618. Lincoln attributes this decline entirely to its post-breach shrink strategy to improve the thrift's capital ratios through branch office closures and deposit runoff. Lincoln completed its branch office closures in April of 1992. Lincoln asserts that the thrift's effort to runoff its deposits in order to improve its capital position

---

[7]The financial documents entered into evidence show Lincoln's deposit figures by year on a consolidated basis.

continued through 1994, when Lincoln began pricing its deposits higher in order to retain its base, but not to attract new customers. The Government argues that in 1991 and 1992 it was Lincoln's high cost of funds, core earnings problems, and limited investment opportunities that caused Lincoln's deposit base to shrink, and not the breach. The Government further asserts that the decline in Lincoln's deposit base after 1992 is attributable to internal and external factors affecting Lincoln that were independent from the breach. Regarding Lincoln's deposit shrink occurring at the end of 1990 through 1992, the court concluded supra that the problems the thrift experienced after the breach were intertwined with the thrift's weakened capital position due to the breach, and not an independent cause of Lincoln's shrink strategy. The court concludes that the amount of foregone deposits Lincoln lost at the end of 1990 through 1992 were due to the thrift's post-breach shrink caused by the breach and therefore contributed to Lincoln's lost franchise value.

Regarding Lincoln's deposit shrink occurring in 1993, 1994, and 1995, the Government points to Lincoln's 1993 Business Plan, prepared at the end of 1992, which states the thrift's goal of stabilizing its deposit base. See PX 969 at PFL002 1034-35. The Government therefore argues that any subsequent decrease to Lincoln's deposits is attributable to factors independent from the breach and cannot be the basis for recovery. Lincoln argues that the thrift did not begin attempts to stabilize its deposit base until 1994, and cites the thrift's 1994 Business Plan, prepared at the end of 1993, as evidence in support of that assertion. See PX 1012 at PL-0002137-38.

Lincoln based its 1992 Business Plan on "management's decision to improve Tangible Capital Ratios; with the stated goal of a 4.5% Tangible Capital Ratio by December 31, 1992 and 5.0% by December 31, 1993. Management has decided to attack this goal from two directions; earnings and reduction in size." PX 827 at PL-172070. Lincoln explains that its goal of $1.1 billion in asset size by December 31, 1992, will be "realized by pricing savings below competition thereby creating savings runoff." Id. at PL-172073. In its 1993 Business Plan, prepared at the end of 1992, Lincoln stated its plan "to continue to improve Tangible Capital Ratios with the stated goal of 5.6% Tangible Capital Ratio by December 31, 1993. Management wishes to attain this goal without any further reduction in size.... [G]rowth potential will be controlled by the [thrift's] profitability and realization of its major goal of a 5.6% Tangible Capital Ratio by December 31, 1993." PX 969 at PFL002 1034 (emphasis added). Lincoln explains that it

> is currently trying to retain savings by paying rates that are slightly higher than national averages. However, competitors, especially in Nebraska, are paying as much as +100 basis points over national averages. Savings can easily be increased if we open our markets to states other than Nebraska, Kansas and Iowa as we found in 1992. Investment potential will dictate whether we do this or not.

Id. at PFL002 1035 (emphasis added). In its 1994 Business Plan, Lincoln states that its capital ratios are "more than adequate and this Business Plan is directed towards improving the [thrift's]

Interest Rate Risk and stabilizing our size. Management intends to continue competing for savings deposits ....” PX 1012 at PL-0002138 (emphasis added). Lincoln again explains that it “is currently trying to retain savings by paying rates that are slightly higher than national averages. However, competitors in Nebraska are paying as much as +100 basis points over national averages.” Id. at PL-0002137 (emphasis added).

Based on this evidence, the court concludes that Lincoln’s efforts to improve its capital ratios through shrinking its deposit base in response to the breach ended with its 1993 Business Plan. The court further notes the presence of independent factors, both internal and external, impacting Lincoln’s operations in 1993, as observed by the OTS during its examination of the thrift in the Spring of 1994. This examination resulted in Lincoln’s composite rating being downgraded to a “3” from the “2” of the previous year, compare DX 736 at PFL004 2425 with PX 1039 at PFL004 2499, and included the OTS’s observation that Lincoln’s “overall condition ... reflects considerable deterioration since the previous ... examination.” PX 1039 at PFL004 2505. At trial, OTS regulator Douglas Pittman testified that during this period “competition for deposits within the state of Nebraska ... was very aggressive, especially among the larger financial institutions. [Lincoln] had made a conscious business decision not to pay up and meet the competition....” Tr. at 2337:25-2338:5.

While the court concluded supra that Lincoln’s 1993 Business Plan directed the thrift to stabilize its savings base, the court recognizes that the implementation of the plan could not occur automatically on January 1, 1993. Similarly, it would be unreasonable to conclude that after over two years of purposeful action to shrink its deposit base, Lincoln’s deposit runoff due to the breach ended in its entirety on December 31, 1992. The court therefore determines that to fairly approximate the transition that occurred in 1993 from a deposit shrink strategy to a deposit stabilizing strategy and the onset of independent intervening factors, Lincoln’s deposit decline through June of 1993 should be factored into its lost franchise value calculation. As such, Lincoln’s foregone deposits due to its post-breach shrink strategy amount to $223,437,499 million. This figure incorporates the shrink to Lincoln’s deposit base that occurred from June 30, 1990[8] through June 30, 1991 ($77,532,228); June 30, 1991 through June 30, 1992 ($86,915,848); and June 30, 1992 through June 30, 1993 ($58,989,423). Compare PX 720 at PFL006 1429 with PX 990 at PFL006 1521. The next step is to determine the correct branch sale premium to apply against Lincoln’s foregone deposits.

As explained above, Dr. Kaplan utilized the United States median premium for large branch transactions of 10.22%, reduced by 25% to reflect the Midwest market for all branch transactions. The Government’s expert, Kennedy, asserts that Dr. Kaplan’s branch sale premium is erroneous because it does not account for the “synergistic value” of Lincoln’s foregone deposits. Kennedy explains that the “synergistic value” includes economies of scale, access to lower cost of funds, market expansion, and improved productivity. In this regard, Dr. Kaplan

[8]Lincoln’s June 30, 1990, Consolidated Financial Statement provides the latest deposit figure prior to the initiation of the thrift’s shrink strategy at the end of 1990.

seems to acknowledge Kennedy's criticism by applying the 25% reduction to his United States median premium for large branch transactions to reflect the below-median performance of Midwest branch transactions. Also, the United States median premium for large branch transactions utilized by Dr. Kaplan is derived from single transactions involving 10 or more branches. Dr. Kaplan justifies using this premium in his calculation because Lincoln closed 24 Nebraska branches after the breach. The important figure for determining Lincoln's lost franchise value in this case, however, is the $223,437,499 million in forgone deposits due to the shrink, of which only $75 million came from the closed branches. As Lincoln itself stated in its post-trial reply brief: "[t]he [G]overnment continues to focus on the branches that Lincoln closed, while blatantly ignoring that Dr. Kaplan's lost franchise value calculation is based on the aggregate amount of foregone deposits ... the vast majority of which came from branches that did not close." Pl.'s Reply at 18 (emphasis original). The court concludes that Dr. Kaplan's use of the United States median premium for large branch transactions to calculate Lincoln's lost franchise value is not sufficiently justified.

The court is convinced that the correct premium to apply to Lincoln's foregone deposits is the median premium for all Midwest branch transactions of 4.38%. See Globe, 65 Fed. Cl. at 358 ("[f]or purposes of calculating a reasonably ascertainable deposit premium, [plaintiff's expert] examined branch deposits that were completed in Oklahoma..."). Using the premium for Lincoln's region better accounts for the "synergistic value" of Lincoln's foregone deposits, as discussed by Kennedy. See Globe, 65 Fed. Cl. at 359-60 ("[t]he limited [branch sale premium] sample for 1998 and 1999 is sufficient for analytical purposes, representing as it does the actual market conditions for branches in Oklahoma at the relevant time."). The Midwest premium is not dependent on the number of branches involved in a transaction, which is not a relevant consideration in this case. The Midwest premium also eliminates the need to make a 25% premium reduction to reflect the below-median performance of Midwest branch transactions. Applying the 4.38% Midwest premium to the $223,437,499 in foregone deposits due to Lincoln's post-breach shrink produces a lost franchise value of $9,786,562. The final step in Dr. Kaplan's calculation is to reduce this figure by 46% to account for just the Great Plains supervisory goodwill eliminated by the breach.

*E. Pro Rata Reduction*

Dr. Kaplan asserts that the pro rata reduction of 46% to his original lost profits model is reasonable in this case. Dr. Kaplan argues that the analysis of how Lincoln would have operated and what damages it would have suffered having only the Great Plains supervisory goodwill must be based upon the actual facts available for examination. Dr. Kaplan states that the only facts available for examination involve how Lincoln operated pre- and post-FIRREA in relation to supervisory goodwill from all three 1982 mergers. Dr. Kaplan states that a thrift's capital has a direct relationship to its asset size and profitability, and the elimination of the Great Plains supervisory goodwill was sufficient to cause Lincoln to shrink the institution, but to a lesser degree. Dr. Kaplan asserts that the actions Lincoln took to shrink the institution following the loss of all of its supervisory goodwill are sufficiently scalable such that a pro rata reduction to account for the court's liability ruling is a valid methodology in this case. The Government

argues that Dr. Kaplan's pro rata reduction to his original lost profits calculation is speculative because it is built upon a misapprehension of the breach and is not founded upon the specific facts of this case. Specifically, the Government asserts that in revising his original lost profits model, Dr. Kaplan made no attempt to determine which branch offices Lincoln would have closed or the amount of foregone deposits Lincoln would have generated but for the elimination of $13.9 million in Great Plains supervisory goodwill.

Once the fact of damage is established and "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1374 (Fed. Cir. 2003). The Federal Circuit has "allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages - but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation." Bluebonnet III, 266 F.3d at 1357. The issue here is whether the 46% reduction to Dr. Kaplan's original calculation of Lincoln's lost franchise value reasonably accounts for the elimination of just the Great Plains supervisory goodwill. The court concludes that it does.

Lincoln did not have the benefit of this court's liability ruling when it initiated its shrink strategy at the end of 1990, which was directed at ameliorating the loss of the supervisory goodwill from all three 1982 transactions, from which the Great Plains supervisory goodwill was indistinguishable. The court concluded supra that a thrift's capital position, asset quality, and core earnings maintained an intertwined relationship. The court also concluded that an elimination of just the Great Plains supervisory goodwill would have caused Lincoln to shrink to a lesser extent. Based on the components of the lost franchise value calculation explained supra, if Lincoln's deposit shrink was lessened, so too would its lost franchise value. The court notes that a pro rata reduction in this case is applied to a lost franchise value calculation that is based on Lincoln's actual foregone deposits due to the shrink. A pro rata reduction in this case is not applied to Dr. Kaplan's projections of Lincoln's foregone deposit growth or yield on foregone deposits, which the court rejected supra as speculative. The court therefore concludes that a 46% reduction to Dr. Kaplan's original lost franchise value calculation provides a reasonable approximation of Lincoln's damages in this case. Applying the 46% reduction to the $9,786,562 in foregone deposits Lincoln suffered due to its post-breach shrink produces a lost franchise value of $4,501,818.

*III. Foreseeability*

Foreseeability is a question of fact. Landmark Land Co. v. United States, 256 F.3d 1365, 1379 (Fed. Cir. 2001). "A lost profits claim in a Winstar case typically assumes that it was foreseeable the breach would force the plaintiff to sell assets that otherwise would have generated profits and seeks to recover the profits." Old Stone Corp. v. United States, 450 F.3d 1360, 1377-78 (Fed. Cir. 2006). The Government argues that regulators could not foresee in 1982 that the elimination of the Great Plains supervisory goodwill would prevent Lincoln from growing or generating profits. The court concluded supra that the Government's breach caused Lincoln to shrink through the runoff of deposits and branch office closures. Because damages in this case

are based on Lincoln's lost franchise value due to its post-breach shrink, whether it was foreseeable that the elimination of the Great Plains supervisory goodwill would prevent Lincoln from growing and generating profits from that growth is not at issue. Rather, the issue is whether it was foreseeable that the elimination of the Great Plains supervisory goodwill would cause Lincoln to shrink following the breach. The court holds that it was.

As the court in Com. Fed. explained, "[t]here are two obvious alternatives for any institution seeking to raise its capital ratios." 59 Fed. Cl. at 343. The first is to raise additional capital, and the second is to "maintain its existing capital base while disposing of assets, which raises the capital ratio by 'shrinking' the firm's asset base." Id. As the Government points out in its post-trial brief, Lincoln's capital levels in 1982 following the Great Plains merger were marginal, and regulators projected the thrift would have a net worth ratio of only .03% above its minium regulatory requirement. Def.'s Br. at 34-35 ¶ 22. The court therefore holds that it was foreseeable that as a result of the elimination of supervisory goodwill from regulatory capital, Lincoln would need to either replace the supervisory goodwill with another form of capital or shrink its assets to improve its capital position, in order to be as well off as it would have been had the contract been fully performed. Here, Lincoln chose to shrink its assets to improve its capital position. See Com. Fed. 59 Fed. Cl. at 354 ("[t]hese consequences were not only foreseeable, they were a basic reason for the enactment of the breaching provisions of FIRREA.").

## CONCLUSION

For the reasons stated above, it is hereby ORDERED that the Clerk of the Court shall enter judgment in favor of the plaintiff in the amount of $4,501,818. Costs for the plaintiff.

s/Lawrence S. Margolis
LAWRENCE S. MARGOLIS
Senior Judge, U.S. Court of Federal Claims

October 31, 2006