Federal Claims

# United States Court of Appeals for the Federal Circuit

FILED
JUN 26 2008
U.S. COURT OF FEDERAL CLAIMS

2007-5044, -5048

FIRST FEDERAL LINCOLN BANK,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

## Judgment

ON APPEAL from the United States Court of Federal Claims

in CASE NO. 95-CV-518

This CAUSE having been heard and considered, it is

ORDERED and ADJUDGED:

**REVERSED IN PART AND AFFIRMED IN PART**

ENTERED BY ORDER OF THE COURT

DATED MAR - 5 2008

Jan Horbaly, Clerk

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: Kelly Warnick Date: 6/26/08

**ISSUED AS A MANDATE:** JUN 26 2008

# United States Court of Appeals for the Federal Circuit

2007-5044, -5048

FIRST FEDERAL LINCOLN BANK,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Paul M. Honigberg, Blank Rome LLP, of Washington, DC, argued for plaintiff-cross appellant. With him on the brief were Edward L. Lublin and Katia I. Fano.

William G. Kanellis, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief was Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Kenneth M. Dintzer, Assistant Director, and Scott D. Austin, Elizabeth A. Holt and John J. Todor, Trial Attorneys.

Appealed from: United States Court of Federal Claims

Senior Judge Lawrence S. Margolis

Association of Wahoo, Nebraska ("Tri-Federal"), and First Federal Savings and Loan Association of Norfolk, Nebraska ("Norfolk").

The Court of Federal Claims found that the government had breached a contract regarding regulatory treatment of goodwill with respect to the Great Plains merger and assessed damages of $4,501,818. First Federal Lincoln Bank v. United States, 73 Fed. Cl. 633, 634, 650 (2006) ("First Federal II"). The Court of Federal Claims found that no goodwill contracts existed with respect to the other two mergers. The government's appeal challenges the Court of Federal Claims' damages determination with respect to the Great Plains merger. First Federal's cross-appeal challenges the determination that no goodwill contract existed with respect to the Tri-Federal and Norfolk mergers. We reverse the Court of Federal Claims' damages award, and affirm its liability determination with respect to the Tri-Federal and Norfolk mergers.

BACKGROUND

I

First Federal was organized as a savings and loan association in Lincoln, Nebraska in 1907. In 1981, when many other thrifts were experiencing difficult financial conditions, the government considered First Federal to be financially healthier than its peers. On November 16, 1981, the Federal Home Loan Bank Board ("FHLBB") included First Federal on a list of potential merger partners distributed to financially troubled thrifts.

In October 1981, Great Plains' accountants informed its management that it had fallen below federally mandated minimum net worth requirements, and advised management to seek a merger partner. First Federal and Great Plains entered into a

preliminary merger agreement on December 8, 1981, which was conditioned, among other things, on government approval for First Federal's use of the purchase method of accounting so as to allow goodwill to be claimed as an asset and amortized over a period of thirty years. First Federal and Great Plains executed a final merger agreement on December 16, 1981, and First Federal filed an application for regulatory approval of the merger with the FHLBB dated December 31, 1981.

On March 24, 1982, the government notified First Federal that its merger application with respect to Great Plains would only be approved if the amortization period for goodwill were reduced to twenty-five years, the loan discount were accreted over the contractual life of the loans, and First Federal accounted for loan prepayments based on actual prepayment experience.[1] These conditions were standard treatment by FHLBB and Generally Accepted Accounting Principles ("GAAP") at the time. First Federal indicated that it would not complete the merger under the conditions proposed by the government. Negotiations ensued, and two forbearances were ultimately granted with respect to the accretion period on Great Plain's mortgage portfolio and the regulatory treatment of certain problematic loans that had been made by Great Plains. However, the government prevailed in restricting the goodwill amortization period to twenty-five years. FHLBB conditionally approved First Federal's merger with Great Plains in a resolution dated May 5, 1982. After completing the merger, First Federal

---

[1] As the Supreme Court has explained, Winstar, 518 U.S. at 852-53, accretion of loan discount refers to the period over which First Federal would be allowed to account for the reduced market value of acquired loans, which at the time of the merger would have had a market value less than their face value.

regulatory forbearances were granted in any of the documents pertaining to the merger. No negotiation took place between First Federal and the government with respect to regulatory treatment of goodwill.

II

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, was enacted on August 9, 1989, and became applicable after implementing regulations became effective on December 7, 1989. See Regulatory Capital, 54 Fed. Reg. 46,845 (Nov. 8, 1989). FIRREA phased out the use of goodwill to satisfy capital requirements. As of the passage of FIRREA, First Federal claimed $13.9 million of remaining goodwill from the Great Plains merger, and a total of $29,977,465 of remaining goodwill from the three mergers combined.

Although in February 1989, prior to the passage of FIRREA, government regulators had deemed First Federal a "fundamentally sound" institution and given it the second best available rating on a five-point rating scale, government regulators issued stark criticism of First Federal and its capital position in 1990 and 1991. First Federal II, 73 Fed. Cl. at 640-41. In June 1990, the Federal Deposit Insurance Corporation ("FDIC") conducted an examination of First Federal, and, in March 1991, it advised First Federal that it would be designated a "problem institution," the second lowest possible rating for a thrift, and informed First Federal that unless its tangible capital level improved by the third quarter of 1991, FDIC would recommend the initiation of regulatory action against First Federal. The Office of Thrift Supervision ("OTS") (successor to the regulatory jurisdiction of FHLBB) conducted a separate examination of First Federal in July 1990, and also criticized First Federal, assigning it a rating of

"marginally resistant to the onset of adverse business conditions." Id. at 640. This rating carried a presumption of formal OTS enforcement action, although no enforcement action was actually taken.

The 1990 government regulatory examinations were critical of First Federal's core earnings performance, level of classified assets, and overall level of assets, although First Federal remained in compliance with minimum capital requirements. The Court of Federal Claims found that this regulatory criticism "flowed from and w[as] intertwined with" the enactment of FIRREA, and that as a result of the regulatory stance taken by the government, First Federal had no choice but to achieve tangible capital ratios in line with the regulators' demands. Id. at 639.

First Federal responded to this regulatory criticism by shrinking its size to improve its capital position. Beginning in October 1990, First Federal closed some branches and priced interest rates on deposits at a low level to run off its least profitable deposits. It appears that a strategy of deposit shrinkage and branch closures improved First Federal's capital position both by reducing operating expenses and because using assets to pay off deposits meant that First Federal's remaining capital represented a larger percentage of its remaining deposits.[2] In total, First Federal closed twenty-eight branches between the enactment of FIRREA and 1992, including twenty-four branches in Nebraska. Between June 30, 1990, (the latest figures available

---

[2] The same strategy of shrinking the deposit base to achieve capital compliance seems to have been used successfully by other thrifts as well. See Globe Sav. Bank, F.S.B. v. United States, 65 Fed. Cl. 330, 345 (2005) ("The FDIC applauded Globe's efforts to shrink drastically in size and achieve capital compliance. In an examination of Globe in 1991, the FDIC opined that Globe had 'sold off assets and deposit liabilities in impressive fashion to meet regulatory capital requirements.'"), aff'd in part and vacated in part on other grounds, 189 F. App'x 964 (Fed. Cir. 2006).

prior to First Federal's initiation of the shrink) and June 30, 1993, (the date the Court of Federal Claims imposed to cut off deposit losses caused by the shrink), First Federal lost deposits totaling $223,437,499.

FDIC examined First Federal again in July 1991, and in this examination, noted a higher tangible capital level than First Federal had reported at the previous examination, while continuing to criticize First Federal's capital position and earnings performance. It upgraded First Federal's overall rating by one level on the five-point ratings scale. In a March 1992 examination, conducted after much of First Federal's shrink had been effectuated, FDIC noted a further increase in First Federal's tangible capital level, which had at all times remained above regulatory minimums, and restored First Federal to the "fundamentally sound" rating it had been given prior to the passage of FIRREA. First Federal never fell below FIRREA's minimum capital requirements, and it was not seized by government regulators.

III

First Federal filed a complaint seeking breach of contract damages in the Court of Federal Claims on August 7, 1985. A bench trial on liability was held in 2003. The Court of Federal Claims issued an opinion concluding that First Federal had established government liability for breach of contract with respect to the Great Plains merger, but had not proven the existence of any contract relating to the treatment of goodwill in conjunction with the Tri-Federal or Norfolk mergers. First Federal Lincoln Bank v. United States, 58 Fed. Cl. 363, 369-70 (2003) ("First Federal I").

The Court of Federal Claims reasoned that the terms of the Great Plains merger had been extensively negotiated between First Federal and the government, including

negotiations concerning the treatment of goodwill. The court found that this showed the government's intent to contract for use of the purchase method and amortization of goodwill over a twenty-five year period. Id. at 369. The Court of Federal Claims found that, with respect to this merger, "the terms of the merger approval were extensively negotiated between Lincoln and the FHLBB," id. at 368, and that "all the issues raised by [First Federal's] proposed modifications, including the goodwill amortization period, were part of the negotiations." Id. at 369.

With respect to the Norfolk and Tri-Federal mergers, however, the court reasoned that there was no indication of the government's intent to contract, because there was no evidence of negotiation with respect to goodwill, and the negotiations with respect to the Great Plains merger had not been used as a template for the other two mergers. Id. at 370.

> Plaintiff argues . . . that the negotiations that took place with regard to the Great Plains merger should also be viewed as negotiations for the other two mergers. . . . Plaintiff provides no evidence, however, that indicates that it communicated that sentiment to the FHLBB. Nor does that theory seem to match up with reality, as [First Federal] did not provide the same documentation for each of the three mergers.

Id. The Court of Federal Claims concluded that "[i]n this case, the plaintiff has failed to provide evidence that such a contractual undertaking was intended between the FHLBB and [First Federal] with regard to either the Tri-Federal or the Norfolk mergers." Id.

A second trial on the issue of damages was held between May 22, 2006, and June 2, 2006. First Federal sought damages, relating only to the Great Plains merger, in the amount of $30,688,000, for lost franchise value and lost profits associated both with deposits it actually lost and lost opportunities for growth. The Court of Federal Claims concluded that the breach of the Great Plains Winstar contract caused First

Federal to begin to shrink its deposit base, and that this strategy was a response to regulatory criticism. That criticism was either directly caused by the breach or was so closely related to the breach that it could not be separated for purposes of the causation analysis. The court also concluded, however, that First Federal had not adequately proven either that it would have realized a profit on its lost assets or that its deposits would have grown absent the breach. It thus rejected First Federal's claims for lost profits and lost deposit growth as speculative. The court valued the deposits lost in First Federal's shrink between 1990 and 1993 based on data relating to the premiums paid for financial institution deposits in 2001, and ultimately assessed damages for lost franchise value in the amount of $4,501,818.

The government appeals the Court of Federal Claims' ruling on damages, and First Federal cross-appeals the earlier ruling as to liability for the Norfolk and Tri-Federal mergers. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We review the Court of Federal Claims' conclusions of law without deference and review its factual findings under the clearly erroneous standard. Bank of Am., FSB v. Doumani, 495 F.3d 1366, 1371 (Fed. Cir. 2007).

## DISCUSSION

### I

We first address the damage award with respect to the Great Plains merger. All of the damages awarded to First Federal were allegedly incurred as a result of shrinking its deposit base between June 30, 1990, and June 30, 1993, in order to comply with capital requirements under FIRREA. Assuming that the Court of Federal Claims correctly held that the implementation of FIRREA caused First Federal's shrink, the

government argues that the Court of Federal Claims erred in concluding that First Federal had adequately proven its lost franchise value damages. The government urges that the Court of Federal Claims erred by calculating the lost value as of the date of trial, based on 2001 data, rather than as of the 1990 to 1993 period when the deposits were lost.[3] First Federal argues that the use of 2001 data was proper and was designed to approximate the value of the lost deposits on the date of trial. The Court of Federal Claims agreed. We agree with the government.

A

In general, in an action for breach of contract, "the appropriate date for calculation of damages is the date of breach." Energy Capital Corp. v. United States, 302 F.3d 1314, 1330 (Fed. Cir. 2002); see also Estate of Berg v. United States, 687 F.2d 377, 380 (Ct. Cl. 1982) ("As a general rule, our law has adopted the standard of market value at the time and place of the failure to perform as the basis for measuring the compensation to which the injured promisee is entitled."). In this case, the government breached its agreement with First Federal when it required First Federal to shrink its deposit base during the 1990-1993 period to remain in capital compliance. Our decision in Energy Capital recognized an exception to the general rule that contract damages are measured as of the date of the breach for

> anticipated profits or . . . other expectancy damages that, absent the breach, would have accrued on an ongoing basis over the course of the

---

[3] First Federal maintains that the government failed to object at trial to the use of the 2001 valuation date for the lost deposits claim. There was, however, no reason for the government to do so because at trial First Federal did not separately claim the value of the lost deposits; rather, the lost deposits calculation was simply an ingredient of the overall lost profits claim. The lost deposits were treated as a separate claim only in the decision of the Court of Federal Claims when the overall lost profits claim was rejected as speculative.

> contract. In those circumstances, damages are measured throughout the course of the contract. To prevent unjust enrichment of the plaintiff, the damages that would have arisen after the date of judgment . . . must be discounted to the date of judgment.

302 F.3d at 1330. As we have previously explained, expectancy damages are "the benefits the nonbreaching party expected to receive in the absence of a breach." Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005). First Federal asserts that valuation as of the time of trial was appropriate, under Energy Capital, because its lost franchise value claim represents expectancy damages.

Contrary to the dissent, the claim allowed by the Court of Federal Claims is not a claim for lost profits or expectancy damages. First Federal's claim for lost profits was disallowed by the Court of Federal Claims, and that ruling has not been appealed. While First Federal at times has characterized the lost deposits aspect of its claim as seeking "lost profits," First Federal has recognized that "The Trial Court Awarded Damages Based on the Value of the Foregone Deposits, Not the Earnings that the Foregone Deposits Would have Generated." Br. of Plaintiff-Cross Appellant at 51.[4] In other words, the Court of Federal Claims actually allowed recovery of lost value on the theory that First Federal was damaged by the forced elimination of deposits in the

[4] First Federal further asserted in its brief that the government's arguments

> ignore[] that the trial court declined to award any damages resulting from lost earnings on foregone deposits. Instead, the court awarded damages for the value of the deposits [First Federal] actually lost as a result of the government's breach. Thus, the government's arguments concerning the difficulty of proving profits flowing from lost leverage capacity . . . are a non sequiter.

Brief of Plaintiff-Cross Appellant at 51 (citation omitted, emphases in original).

1990-1992 period. Paradoxically, the Court of Federal Claims did not value this loss at the date the loss occurred, but rather valued the loss, years later, at the date of the trial.

Thus, the claim for lost franchise value associated with lost deposits allowed by the Court of Federal claims was in fact a claim for loss of income-generating property.[5] The market value of income-generating property reflects the market's estimate of the present value of the chance to earn future income, discounted by the market's view of the lower future value of the income and the uncertainty of the occurrence and amount of any future property. See Schonfeld v. Hilliard, 218 F.3d 164, 176 (2d Cir. 2000) (citing Dan B. Dobbs, Law of Remedies § 3.3(7) (2d ed. 1993)). It has been established that the damages for lost income-producing property is properly determined as of the time the property is lost (usually the time of the breach) because the market value of the lost property reflects the then-prevailing market expectation as to the future income potential of the property, and it is precisely this opportunity that the nonbreaching party has lost.

> When the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value of the asset at the time of breach--not the lost profits that the asset could have produced in the future.

Id. (emphasis added). The Second Circuit explained that a prominent treatise supports this reasoning because "[m]arket value damages are 'based on future profits as estimated by potential buyers who form the 'market'' and 'reflect the buyer's discount for the fact that the profits would be postponed and . . . uncertain.'" Id. (quoting Dobbs,

---

5 Although deposits are liabilities, they are in many ways similar to income-generating property. The bank pays interest on the deposits, but loans the money at a

Law of Remedies § 3.3(7), at 313 & n.2). Valuation as of the date of the breach is also consistent with the general principle that lost property is valued as of the date of the breach. See Energy Capital, 302 F.3d at 1330; 11 Joseph M. Perillo, Corbin on Contracts § 55.13, at 50 (rev. ed. 2005) (explaining that value of lost asset is determined as "the amount of money that the plaintiff could have obtained [for it] from other people at the time and place."); see also 24 Richard A. Lord, Williston on Contracts § 64:4, at 51 (4th ed. 2002) (quoting Schonfeld's statement that lost assets are properly valued as of the date of the breach).

It is of no consequence here that First Federal was unable to obtain replacement deposits at the time of the shrink. Even when income-producing property cannot be replaced by the nonbreaching party, damages for the loss of such property are based on its market value as of the date of the breach. For example, in Schonfeld, two investors had breached a contract to provide capital to a closely-held cable television corporation. 218 F.3d at 177-180. As a result, the corporation lost an exclusive license to distribute certain BBC television programming in the United States for a 20-year period. Id. at 179. Although the exclusive license could not have been replaced, because of the lack of capital resulting from the breach, the Second Circuit held the damages were properly based on the prevailing market value of the lost exclusive license at the time of the breach. Id.

For the same reasons, the loss suffered by First Federal as a result of the lost deposits is properly measured by the prevailing market value of those deposits at the

---

higher rate, thus generating a profit. The deposits here have a value reflected in the premium that other banks are willing to pay to acquire such deposits.

time they were lost. We conclude that the Court of Federal Claims erred in awarding value of the lost deposits as of the date of the trial, based on 2001 data.

B

We next turn to the question of whether First Federal is entitled to recover lost franchise value at the date of the breach, i.e. 1990-1993. Two things are fatal to any such claim here. First, First Federal has never made such a claim either before the Court of Federal Claims or on appeal. It chose to proceed entirely on a future lost profits theory, which was rejected by the Court of Federal Claims, and on a lost future value theory, which we have rejected in the preceding section of this opinion. First Federal never asserted a claim for the value of the deposits at the time of the loss.[6] The mere fact that the government, on appeal, presented its own estimate of the market value of First Federal's lost deposits as of the time they were lost based on trial exhibit DX-1321 (discussed below) does not preserve a claim for damages that First Federal did not itself assert either at the damages trial or on appeal.

Second, there was no finding by the Court of Federal Claims as to deposit values in the 1990-1993 period, and First Federal has agreed that there is no record evidence that would support such a finding.[7] The only specific indication of the deposit premium

---

6 See First Federal II, 73 Fed. Cl. at 646. Dr. Kaplan's testimony at trial makes clear that his calculation was based on the market value of deposits in approximately 2001, and was intended to approximate the market value of the forgone deposits as of the date of trial. Dr. Kaplan's model also included a separate approximation of the net profit that these deposits would have generated between the time they were lost and the date of the trial, as the dissent describes, but the Court of Federal Claims rejected that claim.

7 At oral argument, when asked whether there was any evidence introduced at trial as to the value of the deposit at the date of the breach, First Federal responded that "[t]here was no evidence because the trial court correctly . . . valued the deposits as of the presumed date of the trial." Oral Arg., at 12:50-13:04.

applicable between 1990 and 1993 was a demonstrative exhibit, DX-1321, used by a government expert witness, Dr. Rochester. First Federal objected to the admission of this exhibit. Although Dr. Rochester was allowed to use DX-1321 while testifying, the demonstrative exhibit itself was "not . . . admitted for the truth of the matters stated therein." Damages Trial Tr. at 2174 (June 1, 2006). Dr. Rochester did not testify with respect to the deposit values for 1990-1993 reported on DX-1321.

The only other mention of deposit premiums applicable between 1990 and 1993 was by First Federal's expert Dr. Kaplan. Dr. Kaplan's vague testimony, however, only indicates that "[a]s sort of a general approximation, the branch premiums hovered for many of those years . . . from 1990 when the Resolution Trust Corporation started its business, the first year or two you are looking at premiums of about 1 percent. And it crept up to 2 percent, 2 and a half percent in the later years, so you have an incredible distortion." Id. at 1574-76 (May 30, 2006). This testimony appears to relate generally to the period between 1990 and 1996 when the Resolution Trust Corporation was liquidating failed thrifts. However, Dr. Kaplan did not refer to DX-1321 or provide any basis for these estimates. Indeed, he indicated that these estimates are not a fair reflection of "private transactions in the marketplace." Id. at 1576.

Moreover, Dr. Kaplan agreed that the premium or value attributable to deposits, unlike standardized commodities with little variation, is dependent on the particular characteristics of the deposits and branches being transferred and the particular market for deposits prevailing at that time and place. Important determinants of deposit value identified by Dr. Kaplan include the branches' size, their location, the demographics of their customers, the degree of competition to which they are subject, their costs and

profitability, the market's view of their future profitability, and the composition of their deposits including the mix of account types or products represented. There is almost no evidence in the record in this case of the characteristics of First Federal's deposits with respect to these market criteria in 1990-1993.

A claim for an attenuated loss resulting from a breach, like a lost profits claim, must not be speculative and must be supported by evidence providing a reasonable basis for the amount of damages. See Old Stone Corp. v. United States, 450 F.3d 1360, 1377 (Fed. Cir. 2006) (citing Cal. Fed. Bank v. United States, 395 F.3d 1263, 1272-73 (Fed. Cir. 2005); Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001)); see also 3 Dobbs, Law of Remedies § 12.4(3), at 69-70 ("[S]pecial or consequential damages . . . must be proven with reasonable certainty and must not be 'speculative.'"). It is well established that "[a]n expert's testimony will not support a verdict if it lacks an adequate foundation in the facts of the case." Genmoora Corp. v. Moore Bus. Forms, Inc., 939 F.2d 1149, 1157 (5th Cir. 1991) (rejecting expert valuation estimate based on assumptions about financial status and financial report errors which lacked supporting record evidence) (citing cases). Thus, even if Dr. Kaplan's somewhat vague testimony were viewed as supplying average premium data for 1990-1993, that evidence would not be sufficient to show the amount of damages without testimony connecting the data to the actual loss suffered. There is no evidence here that the average premium data for the 1990-1993 period discussed in passing by Dr. Kaplan were representative of the deposits that First Federal lost. Indeed, the only testimony

was Dr. Kaplan's assertion that the estimates he reported did not fairly reflect private market transactions.[8]

Because First Federal is not entitled to damages based on the value of its lost deposits as of the date of the trial, and has neither made nor supported any claim to the value of the lost deposits at the time they were lost, we reverse the Court of Federal Claims' award of damages in favor of First Federal.

II

In its cross-appeal, First Federal argues that the Court of Federal Claims erred in its conclusion that there was no goodwill contract with respect to the Norfolk and Tri-Federal mergers.

"In order to prevail in a Winstar case a plaintiff . . . must establish that a contract existed with the government whereby the government was 'contractually bound to recognize the supervisory goodwill and [particular] amortization periods.'" Franklin Fed. Sav. Bank v. United States, 431 F.3d 1360, 1365 (Fed. Cir. 2005) (quoting Winstar Corp. v. United States, 64 F.3d 1531, 1541-42 (Fed. Cir. 1995), aff'd, 518 U.S. 839 (1996)). To prove the existence of a Winstar contract, like any other contract with the government, "four basic requirements must be met: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003).

This court has previously explained the type of evidence needed to prove the government's intent to enter into a Winstar contract. We have emphasized that

---

8 There is a similar lack of testimony with respect to the figures appearing in

"regulatory proclamations are insufficient to create contractual obligations because . . . '[m]ere approval of the merger does not amount to [an] intent to contract.'" Id. at 1357 (quoting D & N Bank v. United States, 331 F.3d 1374, 1378 (Fed. Cir. 2003)). "An agency's performance of its regulatory or sovereign functions does not create contractual obligations." D & N Bank, 331 F.3d at 1378-79. Rather, "there must . . . be a clear indication of intent to contract and the other requirements for concluding that a contract was formed." Id. at 1378. A plaintiff must provide "something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights." Id. at 1377. In other words, "something more" than mere regulatory approval of the merger must be shown. Id. at 1379-80; see also Mola Dev. Corp. v. United States, Nos. 2007-5058, 2007-5080, slip op. at 11-12 (Fed. Cir. Feb. 25, 2008). At the same time, we have recognized that a formal written agreement is not necessary to prove the existence of a Winstar contract when there is other adequate evidence of the government's intent to form a contract. See Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221, 1231-32 (Fed. Cir. 2005).

No such evidence exists here. There is no evidence that the government took any action to encourage First Federal to merge with either Norfolk or Tri-Federal. There is also nothing in the merger agreements between First Federal and Norfolk and Tri-Federal, or the government's approval letters that could evince the government's intent to enter into a goodwill contract. In both mergers First Federal communicated to the government a request only for, and in both mergers received, standard treatment of goodwill, including use of the purchase method of accounting and amortization of

---

DX-1321, even if we were to assume that DX-1321 constituted record evidence.

goodwill over a twenty-five year period in compliance with GAAP. Neither merger was designated as instituted for supervisory purposes, no government assistance was provided, there were no forbearances with respect to goodwill, and there was no negotiation with respect to the treatment of goodwill.

First Federal does not argue that there is any document that purports to be an agreement between it and the government with respect to the Norfolk or Tri-Federal mergers, or that there were any negotiations at all between First Federal and the government regarding the regulatory treatment of goodwill in these mergers. Instead, stressing the proximity in time of the three mergers, First Federal urges that it and the government used the contractual agreement that was reached with respect to the Great Plains merger as a template for the subsequent mergers. The Court of Federal Claims rejected this argument. It found that (1) First Federal had never communicated to the government that it considered the latter mergers to include the same terms as the Great Plains merger and (2) there were substantial differences between the documents used in the Great Plains transaction and those used in the Norfolk and Tri-Federal transactions, precluding any inference that the government understood the latter transactions as involving the same contractual elements as the former.

Contrary to First Federal's position, we see no inconsistency between the Court of Federal Claims' holding and our decision in Fifth Third. In Fifth Third, we held that a Winstar contract formed with respect to one transaction, could be used as a template for subsequent transactions. 402 F.3d at 1231-32. At the same time, we made clear that each transaction must be considered separately to determine whether a Winstar contract was formed. See id. at 1231-33 (analyzing contract formation as to each of a

series of mergers); see also Hughes v. United States, 498 F.3d 1334, 1339-40 (Fed. Cir. 2007) (recognizing that separate contractual documents with respect to the same transaction must be analyzed separately if they could constitute separate agreements).

In Fifth Third, a Winstar contract embodied in the documents exchanged between the parties, was formed in a first merger, as confirmed by express negotiation about the use of goodwill, and in three subsequent mergers both the government and the thrift "understood that the parties were agreeing to the same terms as those in the [first] acquisition." 402 F.3d at 1232. Although the subsequent mergers used less detailed documents, we emphasized that the evidence of negotiation was particularly strong as to each of the mergers, and that the negotiations for each "followed a similar pattern." Id. at 1227. The government first contacted the acquiring institution to propose each merger; the acquiring institution "requested FSLIC cash assistance," and the government "responded each time that no cash assistance was available, but that instead [it] could offer the same regulatory and accounting treatment of supervisory goodwill that had been used in the [first] transaction." Id.

Unlike the factual situation presented in Fifth Third, there is no evidence of an agreement to use the Great Plains merger as a template, and the Court of Federal Claims did not err in finding that each merger was separate and that there was no negotiation with respect to goodwill as to the two later mergers.[9] Nor did the Court of

---

[9] As the Court of Federal Claims further noted in denying reconsideration:

> Unlike the mergers in Fifth Third and the Great Plains transaction, the pattern and circumstances of the Tri-Federal and Norfolk transactions evidence that the special treatment of goodwill was not a central part of the agreements. The Tri-Federal and Norfolk mergers involved no pre-merger negotiations regarding the treatment of goodwill and Lincoln

Federal claims err in deciding that the necessity of counting goodwill for regulatory compliance purposes did not establish the existence of contracts with respect to Norfolk and Tri-Federal. See Fifth Third, 402 F.3d at 1233 ("economic irrationality cannot create contracts"). The Court of Federal Claims' conclusion that there were no goodwill contracts with respect to the Norfolk and Tri-Federal mergers is not clearly erroneous.

CONCLUSION

The judgment of the Court of Federal Claims awarding damages is reversed because First Federal was not entitled to recover damages based on the market value of its lost deposits as of the date of trial, and neither claimed nor introduced evidence to support damages based on the value of the lost deposits at the time they were lost. With respect to First Federal's cross-appeal, the challenged liability judgment of the Court of Federal Claims, concluding that no Winstar contract was formed with respect to the Norfolk or Tri-Federal mergers, is not clearly erroneous and is affirmed.

REVERSED in part and AFFIRMED in part

COSTS

No costs.

---

submits no evidence that it ever communicated a request for special treatment of goodwill with respect to the Tri-Federal and Norfolk mergers.

First Federal Lincoln Bank v. United States, 68 Fed. Cl. 200, 203 (2005).

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2007-5044,-5048

FIRST FEDERAL LINCOLN BANK,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Appeals from the United States Court of Federal Claims in 95-CV-518, Senior Judge Lawrence S. Margolis.

MAYER, Circuit Judge, dissenting-in-part.

I dissent from the majority's reversal of the Court of Federal Claims' damages award. The trial court made a reasonable and well-supported determination of the damages sustained by First Federal Lincoln Bank ("First Federal"), and the majority offers no persuasive justification for setting it aside. Furthermore, after deciding to jettison the expectancy damages theory upon which this case was tried, the majority precludes First Federal from presenting evidence as to the damages it suffered under the majority's newly-adopted damages paradigm. This is fundamentally unjust.

## I. Standard of Review

The Court of Federal Claims conducted a two-week trial on damages, at which it heard expert witnesses from both sides, weighed the evidence and made a determination as to the quantum of damages sufficient to remedy the government's breach. As the majority acknowledges, the trial court properly determined that First Federal was entitled to damages for the value of deposits it was forced to run off to

comply with elevated capital requirements. Ante at 11. The majority does not dispute that the trial court's award of approximately $4.5 million in damages was a reasonable approximation of the value that First Federal's deposits would have had, at the date of trial, if the breach had not forced it to "shrink" by running off deposits. The majority concludes, however, that the trial court's damages award must be set aside because damages were calculated as of the date of trial rather than as of the date of breach. Id. at 12-14.

This court has long acknowledged that the "ascertainment of damages is not an exact science," Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001), and that "the trial court [is] in the best position to make the factual determinations necessary to establish an appropriate damages award." Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1346 (Fed. Cir. 2003). During a trial on damages, the trial court gains an "intimate familiarity" with the facts in a complex case, see id., and is in a superior position to make intricate judgments as to the quantum of monetary damages sufficient to make an injured claimant whole. Accordingly, this court should set aside a trial court's damages calculation only under exceptional circumstances, such as where the decision is "'clearly unreasonable, arbitrary or fanciful'" or where "'the record contains no evidence upon which the [trial] court could have rationally based its decision.'" Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372, 1377-78 (Fed. Cir. 2004) (quoting Air Land Forwarders, Inc. v. United States, 172 F.3d 1338, 1341 (Fed. Cir. 1999)). In making damages determinations, the Court of Federal Claims "'occupies the position of a jury under like circumstances; and all that litigants have any right to expect is the exercise of the court's best judgment

upon the basis of the evidence provided by the parties.'" Bluebonnet, 266 F.3d at 1357 (quoting Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 573 (Ct. Cl. 1969)).

The majority fails to establish clear error in the trial court's decision to calculate damages as of the date of trial rather than as of the date of breach. To the contrary, the trial court's damages methodology is fully supported—even compelled—by this court's precedent.

II. Discounting Damages to the Date of Judgment

The majority's conclusion that damages must be calculated as of the date of breach was considered and expressly rejected in Energy Capital Corp. v. United States, 302 F.3d 1314, 1330 (Fed. Cir. 2002). There, a financing corporation sued for damages after the government breached a contract allowing it to provide financing for energy improvements in subsidized housing. Id. at 1317-20. The Court of Federal Claims awarded the corporation the profits it lost as a result of the government's breach, discounted to the date of judgment. On appeal, the government argued that the damage award should have been discounted to the date of breach instead of the date of judgment. Id. at 1330. This court rejected that contention, concluding that since lost profits were to accrue over the course of the contract, damages were correctly discounted to the date of judgment. Id.

"'The time when performance should have taken place is the time as of which damages are measured.'" Id. (quoting Reynolds v. United States, 158 F. Supp. 719, 725 (Ct. Cl. 1958)). Lost profits typically have not accrued on the date of breach; they accrue on an ongoing basis throughout the contract term. Id. Because lost profits and

other expectancy damages "would have accrued on an on-going basis over the course of the contract," damages should properly be awarded as of the date of judgment rather than the date of breach. Future profits are discounted to the date of judgment to reflect the present value of money. Id. at 1330 ("Discounting future lost profits to the date of judgment merely converts future dollars to an equivalent amount in present dollars at the date of judgment . . . ."); see also N. Helex Co. v. United States, 634 F.2d 557, 562-64 (Ct. Cl. 1980) (awarding damages for breach of contract discounted to the date of judgment).

The majority is simply wrong when it states that "First Federal's claim for lost profits was disallowed by the Court of Federal Claims . . . ." Ante at 12. The Court of Federal Claims stated—repeatedly and unambiguously—that its damages award was based on a "lost profits" model.[1] First Fed. Lincoln Bank v. United States, 73 Fed. Cl.

---

[1] The Court of Federal Claims explained its damages award as follows:

> Dr. Kaplan's lost profits model calculates [First Federal's] damages based on $550 million in foregone deposits the thrift allegedly lost as a result of the Government's breach. Dr. Kaplan's foregone deposit amount is derived from [First Federal's] post-breach (1) shrink and (2) missed growth opportunities. The court concluded *supra* that Dr. Kaplan's projection of [First Federal's] post-breach deposit growth rate is speculative and therefore rejects the alleged $250 million in foregone deposits from [First Federal's] missed growth opportunities that Dr. Kaplan factors into his lost profits model. Remaining is the alleged $300 million in foregone deposits from [First Federal's] post-breach shrink, which is comprised of $225 million from deposit runoff and $75 million from branch office closings. The court concluded *supra* that the breach caused [First Federal] to shrink its institution and, therefore, [First Federal] may recover damages from the foregone deposits due to that shrink.
>
> As explained *supra*, Dr. Kaplan's lost profits model calculates damages by adding [First Federal's] lost earnings

633, 643 (2006). The damages award was premised entirely on the "lost profits" model prepared by First Federal's expert witness, Dr. Donald Kaplan. Id. This model had two components: (1) "$250 million in deposits lost from missed growth opportunities," and (2) "$300 million in deposits lost due to the shrink." Although the trial court rejected the first component of Dr. Kaplan's model as unduly speculative, it awarded damages based on "what remain[ed] of Dr. Kaplan's lost profits model" which was "his calculation of [First Federal's] lost franchise value due to the foregone deposits caused by the thrift's post-breach shrink." Id. (emphasis added).

The trial court's damage award was designed to approximate "the discounted present value of the net interest income, operating expenses, and fee income generated by the foregone deposits in perpetuity." Id. Given that the damage award was essentially an award for projected revenues—less projected expenses—on foregone deposits, it is hard to fathom how it can be perceived as anything other than a lost

---

> from foregone deposits with [First Federal's] lost franchise value due to foregone deposits and is then reduced pro rata by multiplying it by 46%. The court concluded *supra* that Dr. Kaplan's calculation of [First Federal's] lost earnings from foregone deposits is speculative because it relies on a proxy to determine the thrift's yield on foregone assets. What remains of Dr. Kaplan's lost profits model is his calculation of [First Federal's] lost franchise value due to the foregone deposits caused by the thrift's post-breach shrink. According to Dr. Kaplan, a lost franchise value calculation determines the value the thrift's deposit franchise would have had on the date of trial had the Government not breached its contract. Dr. Kaplan calculates [First Federal's] lost franchise value by multiplying the thrift's foregone deposits by a branch sale premium. Dr. Kaplan asserts that this methodology approximates the discounted present value of the net interest income, operating expenses, and fee income generated by the foregone deposits in perpetuity.

First Fed., 73 Fed. Cl. at 646 (emphases added).

profits award. Although the damage award is sometimes referred to as a "lost franchise value" award rather than a "lost profits" award, the difference between the two types of awards is one of semantics, not substance. The award was specifically designed to compensate First Federal for projected income, less projected expenses, on foregone deposits, and the trial court therefore properly treated it as a lost profits award. See Katz v. Cisneros, 16 F.3d 1204, 1207 (Fed. Cir. 1994) ("Regardless of the characterization of the case ascribed by [the plaintiff] in its complaint," the court must "look to the true nature of the action."); see also LaSalle Talman Bank, F.S.B. v. United States, 462 F.3d 1331, 1337 (Fed. Cir. 2006) (affirming an award of special dividends in a damages award "regardless [of] whether the dividends were called special or mandatory"); Balboa Ins. Co. v. United States, 775 F.2d 1158, 1163 (Fed. Cir. 1985) (surety had right to "total fund" remaining in government's possession regardless of "what [the fund] is called").

The majority's assertion that the trial court's damage award cannot be deemed a lost profits award, ante at 12-14, is also curious because even the government acknowledges that the award was for lost profits. The government explains: "Since a valuation of [First Federal's] franchise (including any premia paid for [First Federal's] deposits) would incorporate the future expected profits of the franchise, it is the equivalent of a 'lost profits' award." Since the damage award was an award of lost profits, under the reasoning of Energy Capital, the trial court was justified in calculating damages as of the date of trial rather than the date of breach.

The majority's assertion that "First Federal's claim for lost profits was disallowed by the Court of Federal Claims, and that ruling has not been appealed," ante at 12, is

not correct. First Federal states expressly that the Court of Federal Claims made an award of lost profits, and argues that that award should be affirmed on appeal:

> The government has failed to meet its burden of showing that the trial court's award of expectancy damages measured by the value of [First Federal's] foregone deposits caused by the government's breach of the Great Plains contract was clearly erroneous, or that the quantum of damages awarded constituted an abuse of discretion. "Lost profits may be recovered where the plaintiff establishes by a preponderance of the evidence that: (1) the loss was the proximate result of the breach; (2) the lost profits were foreseeable; and (3) a sufficient basis exists for estimating the lost profits with reasonable certainty." The Court of Federal Claims found that [First Federal] had satisfied this burden and awarded $4.5 million in expectancy damages based on the diminished value of [First Federal's] franchise resulting from the deposits that the Great Plains breach caused [First Federal] to run off.

First Federal Brief at 44-45 (footnotes and citations omitted) (emphases added); see also id. at 70 ("Lost franchise value models provide a well-settled measure of lost profits in Winstar cases."); id. at 80 ("The trial court correctly awarded expectancy damages based on lost deposit franchise value . . . .").

The Court of Federal Claims did reject one portion of First Federal's claim for lost profits. First Federal initially sought to recover lost earnings on foregone deposits based on an adjustable mortgage backed security ("MBS") rate. The court, however, found that this calculation was unduly speculative because First Federal "did not maintain the adjustable rate MBS in its investment portfolio following the breach . . . ." First Fed., 73 Fed. Cl. at 644. This is the portion of the lost profits award that has not been appealed.

Clearly, lost profits from an asset and that asset's fair market value are related concepts. See, e.g., Protectors Ins. Serv., Inc. v. United States, 132 F.3d 612, 616 (10th Cir. 1998) (the "prospect of future earnings is considered in arriving at the fair

market value of a given business"); Eateries, Inc. v. J.R. Simplot Co., 346 F.3d 1225, 1236 (10th Cir. 2003) ("fair market value '*necessarily* incorporate[s] expected future profits'") (emphasis in original, citations omitted)). The trial court elected to proceed on a lost profits rather than a fair market value model, and the majority has shown no clear error in its decision to do so. See Bank of Am., F.S.B. v. Doumani, 495 F.3d 1366, 1372 (Fed. Cir. 2007) (the clear error standard governs a trial court's "findings about the general type of damages to be awarded (e.g., lost profits)").

The trial court's damages methodology is also fully consistent with Globe, a Winstar case with facts similar, in many respects, to those of the present case. In Globe, the government's breach caused Globe Savings Bank to downsize by disposing of its branch networks. Globe Sav. Bank, F.S.B. v. United States, 65 Fed. Cl. 330, 345-46 (2005), aff'd in relevant part and vacated in part, 189 F. App'x 964 (Fed. Cir. 2006). Globe was forced to run off $160 million in deposits to meet elevated capital requirements. Id. The value of Globe's foregone deposits was calculated using a deposit premium based on branch sales occurring close to the time of trial, not at the time of breach. Id. at 358. The Globe approach to damages was properly used by the Court of Federal Claims as a template for awarding damages in the present case. The court explicitly stated that it was relying on the methodology "affirmed by the Federal Circuit" in Globe. 73 Fed. Cl. at 646.

III. Expectancy Damages

Although the majority acknowledges that expectancy damages, which typically take the form of an award of lost profits,[2] can be awarded as of the date of trial rather than the date of breach, it concludes that the damages for the lost franchise value associated with First Federal's foregone deposits cannot properly be deemed expectancy damages. Ante at 12-14. It cites no authority to support this conclusion. Nor does it cite any authority for the proposition that the franchise value associated with First Federal's lost deposits must be calculated as of the date of breach. Instead, it simply offers the bald assertion that First Federal's "claim for lost franchise value associated with lost deposits . . . was in fact a claim for loss of income-generating property." Id. at 13. It then cites to a case from the Second Circuit, Schonfeld v. Hilliard, 218 F.3d 164, 176 (2d Cir. 2000), for the proposition that income-producing property should be valued at the time of breach rather than the time of judgment.

Schonfeld, however, offers no support for the majority's decision to reject the trial court's damages award. There, the defendants' breach caused the plaintiff to lose an exclusive license to distribute television programming. 218 F.3d at 179. The plaintiff originally claimed damages for lost profits, but the court rejected the claim because the contract related to a new entertainment venture and the plaintiff "could establish neither the existence nor the amount of lost profits with reasonable certainty." Id. at 173.

---

[2] Expectancy damages are the ordinary measure of damages in breach of contracts cases. LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1371 (Fed. Cir. 2003); Glendale Fed. Bank, F.S.B. v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). Such damages make the injured party whole by giving him the benefits he "expected" to receive had the breach not occurred. Glendale, 239 F.3d at 1380. Expectancy damages normally take the form of lost profits, but can also include other incidental damages. LaSalle, 317 F.3d at 1371; Glendale, 239 F.3d at 1380.

However, the court awarded the plaintiff damages for the fair market value of the exclusive license, concluding that the license had a readily ascertainable market value and therefore provided an accurate measure of the loss sustained. Id. at 176-79.

Nothing in Schonfeld conflicts with the Court of Federal Claims' damages determination in the present case. At most, Schonfeld stands for the proposition that, under certain circumstances, an award for the fair market value of an asset provides a more reliable measure of damages than lost profits.

Here, valuing the lost deposits as of the date of breach would have provided neither an accurate nor a reliable measure of the damages First Federal sustained. In the early 1990s, following the government's breach, the savings and loan industry was in a state of tumult. The premia paid for deposits at the time of breach were significantly lower than the premia paid near the time of trial. Because First Federal had little choice about when to divest itself of deposits—it was compelled to run off deposits soon after the government increased minimum capital requirements—its recovery should not be predicated on the relatively low deposit premia prevailing in the period immediately following the government's breach.

"The general type of damages to be awarded, their appropriateness, and rates used to calculate damages are reviewed for clear error." Hunt Trust Estate v. United States, 470 F.3d 1044, 1049 (Fed. Cir. 2006); see Bank of Am., 495 F.3d at 1372. Because there has been no showing of clear error in the trial court's damages award, I would affirm it.

IV. Waiver

Having concluded that damages must be calculated as of the date of breach, the majority then denies First Federal the opportunity to present evidence regarding the damages it suffered as of that date. Given that the government's liability for breach of contract is undisputed,[3] this decision is both puzzling and disturbing.

At trial, First Federal presented extensive evidence about the profits it lost as a result of the government's breach. See First Federal, 73 Fed. Cl. at 643-49. Given that lost profits had been awarded as of the date of trial in both Energy Capital and Globe, First Federal quite reasonably directed its evidence to the value its deposit franchise would have had at the date of trial, if the government had not breached its contract. Id. Although the government raised a wide array of objections to First Federal's damages calculations at trial, it never argued that First Federal's deposits should be valued at the time of breach rather than the time of trial. First Federal therefore had no reasonable way of anticipating that it would need to present damages evidence as of the date of breach.

Even where questions exist as to the exact measure of damages, it is "a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931). The government's liability is clear, and the majority has advanced no persuasive justification for denying First Federal the damages it is due. See Franconia Assocs., Inc. v. United States, 61 Fed. Cl. 718, 746 (2004) ("[C]are must be taken lest the calculation of

[3] The government does not appeal the determination that it is liable to First Federal for breach of contract.

damages become a quixotic quest for delusive precision or worse, an insurmountable barrier to any recovery.").

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

By: Kelly Owens Date: 6/26/08